FILED

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TAMPA    00 NOV 14  AM 9:52
## TAMPA DIVISION

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

**LEONA T. STEELE**
**Plaintiff,**

v.                                CASE NO:  **8:00-CV-52-t-30E**

**TENET HEALTHCARE CORPORATION**
**Defendant**
_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
## SUMMARY JUDGEMENT

1.      Joe Schlagheck was in charge of the Plant Operations Department during

Steele I and my termination.  Both Terry Falke and David Parked worked directly for

him.  Dan Bonk, John Bartlett, and Peter Zinober (in his Unemployment Appeal)

identified Mr. Schlagheck as "recommending my termination".  After the meeting with

Mr. Bartlett on August 8, 1995 with Mr. Park present and Mr. Bartlett questioned me

regarding Steele I Mr. Park became very involved with Steele I including asking

questions about it.  He was involved in my two-day deposition providing information.

Also, in October 1995 he began working independently with the hospital attorneys who

were handling Steele I, Jacqueline Brown and Peter Zinober as well as Corporate Counsel

Phil Davis.  (See Privileged Document Log provided by Zinober and McCrea).

2.      Prior to filing the Steele I suit, I had a very good 2-½ year work record,

including three excellent performance evaluations.  Beginning immediately after the

meeting in August with Mr. Bartlett and the filing of Steele I on August 17, 1995, Mr.

Park began a deliberate campaign to make my life so miserable and turn people against

me to force me to quit.  He began daily making accusations that were outright lies and on

two occasions tried to coerce me into signing statements regarding criminal acts

committed which would have resulted in my immediate discharge.  When I

denied his allegations he would accuse me of calling him a liar, being insubordinate, etc.

He wrote daily memos about me regarding things, which were, suppose to have

transpired between the two of us when no one else was around.  The memos were faxed

to their attorneys within hours of being prepared.  Some of them were addressed to me

but never given to me.   All of them, of course, portray him as the voice of reason and me

as a raving nut. (See attachments to affidavit of Leona T. Steele).  None of the

information was noted on my evaluation done in December, performance was never an

issue.  Mr. Bartlett, in his deposition stated that it was possible there was a plan in place

for Mr. Park to fill my personnel file with so many negative documents that when it grew

fat enough with his lies he could justify terminating me.  Mr. Bartlett also testified that it

was possible there was a plan in place for Mr. Park to make my life so miserable I would

not be able to take it and just quit.

      3.     It is not very likely that the Management staff would come to me and say

"We are firing you in retaliation".  The fact that I was fired without any person in

Management doing an investigation of the incident, or even asking me about it is proof

enough that less than a month after my deposition and one week after firing a coworker I

identified as a witness my termination was retaliatory.   This is an issue that should be

based on my entire work record at Palms of Pasadena and the timeline factored in.  I was

initially fired for "Outrageous Conduct" consisting of deliberately urinating in my chair

during a counseling session, parading around the hallways for two hours in urine soaked clothes displaying myself before going home to change clothes.  When this reason proved to be as ludicrous as it sounds, the reason was changed to "insubordination" when this did not pan out a third reason "disruptive" behavior was used.

4.   The Unemployment Appeals Hearing Officer heard testimony from Joe Schlagheck, Dan Bonk, Margaret Miklos, and David Park.  She, as well as the Appeals Panel; found no justification for my termination.

5.   My relationship with Mr. Park was not a personality conflict.  I was a deliberate and calculated plan to contrive situations to fill up my file with negative information to justify terminating me if I did not quit.

6.   The case law cited does not apply in this instance because none of the employees were subjected to the kinds of personal attacks, abuse, and accusations I was.

I respectfully request that Defendant's Motion for Summary Judgement be denied.

Respectfully Submitted,

Leona T. Steele, Pro Se
5760 Pinewood Drive 429 D-2
Greenacres, FL 33463
561/433-4237

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of **Plaintiff's Response to Defendant's Motion for Summary Judgement** is being furnished by U.S. Mail this ____ day of November, 2000.

> Peter W. Zinober
> Cynthia L. May
> ZINOBER & MCCREA
> Southtrust Plaza
> 201 East Kennedy Blvd, Suite 800
> Post Office Box 1378
> Tampa, FL  33601-1378

Leona T. Steele, Pro Se

JACKSON, LEWIS, SCHNITZLER & KRUPMAN

390 N. ORANGE AVENUE • SUITE 1285 • ORLANDO, FLORIDA 32801
TELEPHONE (407) 246-8440 • FAX (407) 246-8441

ATLANTA, GA
BOSTON, MA
CHICAGO, IL
DALLAS, TX
GREENVILLE, SC
LOS ANGELES, CA
MORRISTOWN, NJ

NEW YORK, NY
PITTSBURGH, PA
SAN FRANCISCO, CA
STAMFORD, CT
WASHINGTON, DC
WHITE PLAINS, NY
WOODBURY, NY

PRIVILEGED COMMUNICATION--PROTECTED
FROM DISCOVERY BY ATTORNEY CLIENT
PRIVILEGE AND ATTORNEY WORK PRODUCT

October 3, 1994

VIA UPS NEXT DAY AIR PAK

Philip G. Davis, Esq.
Associate General Counsel
National Medical Enterprises
P.O. Box 4070
Santa Monica, CA  90411-4070

Re:  Lee Steele v. Palms
     of Pasadena Hospital

Dear Phil:

     This letter will summarize the results of the on-site investigation I conducted in response to the allegations of sexual harassment raised by Mrs. Lee Steele through her attorney's correspondence dated August 26, 1994.

I.   Summary of My Initial Meeting with Hospital Administration

     On Friday, September 9, 1994, I met with Mr. Bill Patterson, the Chief Executive Officer of Palms of Pasadena Hospital, Mr. Joe Schlagheck, Assistant Administrator and Mr. Joe Jackson, Regional Vice President Human Resources. During that meeting, I obtained a copy of Messrs. Patterson and Schlagheck's files regarding Mrs. Steele's complaints. Mr. Jackson informed me the only record of his meeting with Mrs. Steele is contained in the memorandum dated June 9, 1994. He instructed Mr. Patterson's secretary, Sara Cramer, to destroy her notes after this memorandum was prepared. I am enclosing with this letter a copy of each individual's files.[1] I believe you will find Mr. Schlagheck's file

---

[1]  Mr. Patterson's file is enclosed as Exhibit "A". Mr. Schlagheck's file is enclosed as Exhibit "B". Mr. Jackson's memorandum is enclosed as Exhibit "C".

Philip G. Davis, Esq.                                    October 3, 1994
National Medical Enterprises                                      Page 2

memorandum of particular interest because it documents his efforts
at responding to and investigating Mrs. Steele's complaints
regarding the fishing trip. His memorandum also documents the fact
that Mrs. Steele did not complain to him about sexual harassment
and, further, when he asked her for particulars regarding her
complaint, she refused to provide him with any details. I believe
these memoranda will be helpful in defending Mrs. Steele's attack
on the sufficiency of the Hospital's response to her complaint.

II. <u>My Initial Meeting with Mrs. Steele</u>

          I also met with Mrs. Steele while at the Hospital on
September 9, 1994. Mrs. Steele was not expecting me to meet with
her since her attorney had previously canceled our meeting. After
introducing myself to Mrs. Steele, I told her that I did not intend
to question her regarding her claims of sexual harassment. I told
Mrs. Steele that I wanted her to know that her claims would be
investigated thoroughly and, if it is determined that a violation
of the Hospital's policy against sexual harassment has occurred,
the appropriate remedial action would be taken. I advised Mrs.
Steele that there would be no retaliation taken against her for
making her complaints and if she thought she was being retaliated
against she should let Mr. Patterson or you know. When I mentioned
Mr. Patterson's name, Mrs. Steele responded negatively. She told
me she had no confidence in Mr. Patterson, that his response to
date had "been a joke". She told me that everyone thought his
"zero tolerance" meeting was a joke because he refused to explain
what he meant. She was also critical of the fact that he had
failed to respond to her memorandum in which she had advised him of
two more instances of sexual harassment that had occurred right
after his meeting. Although Mr. Patterson had said he would be
available and she should come to him with any additional
complaints, she found that when she tried to do so he ignored her
or directed her to Mr. Schlagheck. From her perspective, she did
not think he was at all interested in whether or not there are
problems of sexual harassment in the Hospital.

          Mrs. Steele then related to me her belief that the
historical pattern at Palms is to fire the person who makes the
complaint. She stated this had happened to the department
secretary two secretaries ago. She claimed this secretary was
fired after making a complaint of sexual harassment against Mr.
Falzone, a department employee.[2]

————————————————————

          [2] Mrs. Steele's information is inaccurate regarding the
identity of the alleged harasser. As best I could tell, there was
not a complaint about sexual harassment against Mr. Falzone.
However, there does appear to have been a complaint of sex

Philip G. Davis, Esq.                                    October 3, 1994
National Medical Enterprises                                      Page 3

         I asked Mrs. Steele whether she was currently being
harassed. She told me there was one employee in particular who was
continuing to harass her but refused to identify the employee or
the conduct. I told Mrs. Steele that it would be difficult to
investigate her complaint without her cooperation and asked her to
speak with her attorney and let her know of our continuing request
for her full cooperation. I told Mrs. Steele NME did not want her
to be working in an environment that was causing her any mental
stress and offered to discuss with you whether she should be placed
on a paid leave while this matter is being investigated. She told
me this was not necessary. She said "things are not so bad that I
need to be hospitalized."

         Mrs. Steele did relate one incident she believed
demonstrates that sexual harassment is hospital wide. She told me
a security guard had made a remark after watching an overweight
female walk by that he could not understand how anyone could rape
a fat person. Mrs. Steele told me she found the remark offensive.
I asked her whether she found the security guard she found the
remark offensive and she said "no," her therapist had instructed
her to ignore the harassment. I responded by pointing out to Mrs.
Steele that I was not trying to second guess her therapist's advice
but nonetheless there is some obligation on her part to let the
other person know when conduct is offensive.

III. <u>Summary of the On-Site Investigation</u>

         I returned to the Hospital on September 19 and 20,1994.
On September 19, I individually interviewed each employee working
in the plant operations department. On September 20, I interviewed
Jill Fleiger, Human Resources Director, Sheila Ginsley, the
previous plant operations department secretary, and Dan Bonk, the
recently hired Chief Operating Officer. Before summarizing the
results of these interviews, I thought it would be helpful to
summarize the Hospital's initial response to Mrs. Steele's
complaints. This summary is based largely on the interviews I
conducted on September 9 but also includes some input from my
September 19 and 20 interviews.

_____



discrimination, among other things, against Mr. Falke. Moreover,
this secretary, Vicky Weekly, was terminated for making complaints
against management. Thus, to this extent, Mrs. Steele's perception
of the Hospital's response to the employee's complaint appears to
have some basis in fact. A copy of Ms. Weekly's personnel file is
enclosed as Exhibit "D". This matter is discussed in greater
detail in a subsequent section of this letter.

Philip G. Davis, Esq.                           October 3, 1994
National Medical Enterprises                              Page 4

A.    Summary of the Hospital's Initial Investigation

     Mrs. Steele's attorney's letter asserts that Mrs. Steele
initially attempted to resolve the harassment by reporting the
incidents to her immediate supervisor, Terry Falke.  As best I can
determine at this juncture of the investigation, I believe this is
a reference to Mrs. Steele's complaints that she was excluded from
the fishing trip.  Based on my interviews with the department
employees and Mr. Falke, it appears that his response to the
fishing trip incident satisfied no one.

     Beginning in 1988, the plant operations department has
held an annual fishing trip.  Since all of the employees working in
this department are men (with the exception of the department
secretary), only men have historically gone on this fishing trip.
Their wives have not been invited although some have brought their
sons (but not daughters).  The previous department secretaries
never sought to be included in the fishing trip.  When the notice
of the 1993 fishing trip was posted, Mrs. Steele signed up.  This
immediately brought a negative reaction, especially from Mr. Tony
Vencis.  Mr. Vencis related to me that he objected to Mrs. Steele
inviting herself along on what had always been a men's trip and
tried to persuade her to agree not to go.  He told me that he
suggested to her and to Mr. Falke that they be allowed to have the
men's trip one more time and next year's trip could be a family
outing.  According to Mr. Vencis, Mrs. Steele was "defiant" in her
insistence that she was going.  Mr. Vencis related to me that he
was angered by the way Mrs. Steele tried to force herself into the
situation.  Mrs. Steele eventually canceled from the trip but it
appears the damage was already done.

     In a department meeting after the trip, Mr. Vencis was
quite vocal in his opposition to women being included in what had
always been a men's trip.  During the interviews, several of the
department employees expressed their view that these comments and
the reaction of some of the men was sex discrimination.  One of the
employees who spoke up and defended Mrs. Steele in this meeting was
Rick Ladd.  The following year when the fishing trip was being
planned, he told me he was specifically told by Mr. Festa that he
was not being invited because he had defended Mrs. Steele.

     I do not know the extent to which the department was
already divided before this incident.  There is no question,
however, that this incident created a divisive situation in the
department.  Moreover, Mr. Falke took no initiative to repair the
division.  In fact, his refusal to get involved has allowed this

Philip G. Davis, Esq.                                  October 3, 1994
National Medical Enterprises                                    Page 5

situation to continue to fester.[3]  As a result, Mrs. Steele is
viewed with animosity by most of the men in the department.

Mrs. Steele first complained of sexual harassment in a
letter brought to the attention of the Ethics Action Line dated
March 26, 1994.  There, she complains about two specific incidents.
The first allegedly occurred in mid-February when she went into the
mechanical room to locate a blank daily worksheet form.  She asked
the men in the room at the time whether anyone had the form.  She
was called over to one of the men's lockers and when he opened the
locker door, there was a letter size caricature of distended male
genitals at eye level.  She says she pretended to ignore the
picture and left the room.  The second incident occurred March 14
at around 8:00 a.m.  She entered the mechanical room to get coffee
and there was a cartoon out of the editorial section of the
newspaper that had been altered to include big blue nipples on the
woman's breasts and the initials PPH had been inserted as one of
the agency employees staring at the woman's breasts while she is

---

[3] This past Spring when it came time for the annual fishing
trip, Mr. Falke states he told the men in the department that the
Hospital would not sponsor the trip.  When I met with Mr.
Schlagheck on September 9, he insisted the Hospital had not
sponsored the trip and there was nothing the Hospital could do if
the men wanted to have a private fishing trip.  When Mrs. Steele
complained that Mr. Festa was soliciting vendors to contribute to
the fishing trip, Mr. Schlagheck says he investigated and could
find no support for her claims.  When he reported this to Mrs.
Steele, she accused him of being part of the cover up.

When I first listened to Mr. Schlagheck's description of his
investigation of Mrs. Steele's complaints regarding the fishing
trip, I was persuaded that Mr. Schlagheck had made a good faith
investigation and I thought that Mrs. Steele was making a "mountain
out of a mole hill" over this matter.  I am no longer quite so sure
this is the case.  The four employees in the department who were
supportive of Mrs. Steele's complaint regarding her exclusion from
the 1993 fishing trip were all skeptical of the Hospital's claim
that there was no Hospital involvement in this year's trip.  Mr.
Schlagheck does not appear to have a great deal of credibility with
these employees and Mr. Falke has even less.  The entire department
appears to share this sentiment, particularly with respect to Mr.
Falke.  The greatest difficulty I have in assessing this entire
matter is the fact that the Hospital management, from Mr. Falke up
through Mr. Patterson and including the Human Resource department,
has little credibility with any of the employees in this
department.  Thus, there was a great deal of reluctance to speak
openly with me during the interviews.

Philip G. Davis, Esq.                                    October 3, 1994
National Medical Enterprises                                     Page 6


complaining about sexual harassment. Mrs. Steele claimed that she
deliberately left the cartoon there to see what Mr. Falke would do
when he went for coffee. She claims she was told by others that he
read the cartoon, poured his coffee and walked out. Mrs. Steele
also asserts in this letter that she has since learned that
sexually explicit materials, jokes, pinups, etc. seem to be allowed
and no one has ever said anything.

     Subsequent to this letter, Mrs. Steele faxed to the
Ethics Action Line a copy of a written joke that Craig Snyder had
given her. The joke was sexual in nature. This occurred in April
1994.

     In early May, the Ethics Committee contacted Mr.
Patterson to inform him of Mrs. Steele's complaints. In addition
to her complaints of sexual harassment, Mrs. Steele had also
complained that she was threatened with discharge by Ms. Fleiger if
she did not support Mr. Hansen's termination; that Mr. Falke had
falsified bids; that Mr. Falke had threatened her with disciplinary
action for making complaints; and, Mr. Falke had failed to take
seriously two incidents of threatened workplace violence by
employees in the department.

     On May 9, 1994, there was a telephone conference call
between Messrs. Patterson, Schlagheck, Ms. Fleiger and Denise
Louie, a member of the NME law department and counsel to the Ethics
Committee. John Bartlett, Neil Hadley and/or Mary Adamson may also
have participated in this call. Enclosed with this letter is a
copy of a file memorandum that was prepared the day of the
conference memorializing the discussions and the agreed upon
response. It was decided that Mrs. Steele's complaints of sexual
harassment would be dealt with by counseling Terry Falke that he
was not to permit sexual harassment to occur in his department. It
was also decided that Mr. Patterson would conduct a department
meeting to address this issue. The file memorandum states that the
CEO will counsel Mr. Falke individually prior to addressing the
entire department staff. The memorandum states that in the
department meeting the CEO will review the contents of NME's sexual
harassment policy and provide examples of what sort of conduct is
considered offensive and the disciplinary action (i.e. dismissed)
that will be taken against the offender. A copy of this memorandum
is enclosed as Exhibit "E".

     These directions were not followed by Mr. Patterson. It
is my understanding that Mr. Schlagheck, not Mr. Patterson
counseled Mr. Falke. Moreover, Mr. Falke told me in our interview
that he was learning for the first time the specifics of the
allegations of sexual harassment by Mrs. Steele. Prior to this
interview, he had not been shown a copy of the cartoon or the

Philip G. Davis, Esq.                                    October 3, 1994
National Medical Enterprises                                     Page 7

written joke nor was he given a description of the caricature in
the locker.

Even more significant, when Mr. Patterson met with the
plant operations department employees, he did not give any examples
of what conduct is considered to be sexual harassment.  One of the
employees attending the meeting asked for examples and Mr.
Patterson refused to provide any explanation.  Instead, he simply
repeated that there was "zero tolerance" for harassment.

Every employee who attended this meeting reported to me
during the interviews that Mr. Patterson's meeting had been totally
ineffective because no one understood what it was that had been
done that led to the meeting and, consequently, they did not
understand what it was they were not to do in the future.  Several
interviewees told me they left the room confused, knowing less than
when they had entered the room.  A number of the interviewees
echoed Mrs. Steele's statement to me that the meeting was a "joke".

At the time of this meeting, the identity of the men
involved in the locker incident was not known.[4]  A decision was
made not to undertake an investigation of the complaints and no one
from Hospital management spoke individually with any of the
department employees.  Mr. Snyder was not questioned regarding the
joke nor was he individually counseled regarding this incident.

On May 16, 1994, Mrs. Steele sent Mr. Patterson a
memorandum as a follow-up to the May 12 meeting.  In this
memorandum, Mrs. Steele states that "within 24 hours there had been
2 more incidents, directed at me, which fall within the scope of
sexual harassment."  Mr. Patterson ignored Mrs. Steele's
memorandum.  When I questioned him regarding his lack of response,
he told me the memo did not ask him to do anything.  It was
apparent from his reply to this question, as well as from his
overall demeanor during this meeting, that Mr. Patterson has viewed
this whole matter as a nuisance and has failed to take seriously
Mrs. Steele's complaints.

Mrs. Steele also sent Mr. Schlagheck a memo complaining
that certain male department employees had solicited vendors to
contribute to their fishing trip.  Mr. Schlagheck undertook an
investigation of her complaint.  On May 31, 1994, Mr. Schlagheck
met with Mrs. Steele to report the results of his investigation.

_____

[4]    Their  identity  was  first  revealed  in  Mrs.  Steele's
attorney's August 26 letter. The locker allegedly belonged to Mr.
Deming. Bob Hudson was also identified as being in the mechanical
room at the time of the incident.

Philip G. Davis, Esq.                                   October 3, 1994
National Medical Enterprises                                     Page 8

Mrs. Steele expressed her dissatisfaction with Mr. Schlagheck's conclusion that the Hospital had no involvement in the fishing trip. Mrs. Steele accused Mr. Schlagheck and the Hospital of covering things up and also expressed her disappointment that Mr. Patterson had not responded to her memo informing him of additional incidents of sexual harassment. Mr. Schlagheck told me during our interview that this was the first he knew there were additional incidents. Mr. Schlagheck told me that Mr. Patterson had not shared with him Mrs. Steele's earlier memo.

Mr. Schlagheck asked Mrs. Steele to give him the names of the individuals she felt had harassed her so he could investigate and/or discipline appropriately. She refused, stating that while she thought the conduct constituted sexual harassment, she did not think the staff had acted from a malicious intent but simply did not understand what constitutes sexual harassment. According to Mr. Schlagheck, he and Mrs. Steele agreed during this meeting that an "in-service" would be an appropriate response. Following this meeting, Mr. Schlagheck contacted Mr. Jackson to inform him of Mrs. Steele's complaints and requested his assistance.

On June 9, 1994, Mr. Jackson met with Mrs. Steele to investigate her complaints of sexual harassment. Mr. Patterson's secretary, Sara Cramer, sat in on the meeting and took notes. After the meeting, she prepared a typewritten memorandum of the meeting. Mr. Jackson instructed Ms. Cramer to destroy her notes of the meeting after preparing the memorandum. When I met with Mrs. Steele on September 9, she was highly critical of Mr. Jackson and this meeting. She told me she found Mr. Jackson offensive and did not think he had taken her complaint seriously. She was particularly critical of the fact that he had not asked her to identify a single witness and felt he showed no interest in investigating her complaint.

Mr. Jackson's memo of the meeting indicates Mrs. Steele agreed that the best response to her complaints would be to conduct sexual harassment training. After speaking with Mrs. Steele and observing her reaction to mention of Mr. Jackson, I would expect she will dispute this fact. Rather, I expect she and her attorney will emphasize the fact that no independent investigation was undertaken by Mr. Jackson in response to her complaints. In any event, Mrs. Steele did describe in this meeting four additional incidents of sexual harassment:

1. During Hospital week, the Hospital was giving out stadium cushions. Two employees came in to get their cushions and one of them said to her, "you sexy thing."

Philip G. Davis, Esq.                                    October 3, 1994
National Medical Enterprises                                      Page 9

> 2.   Mark Miller, a department employee, said that from
>       now on, when a nurse leaves this facility, he was
>       going to "strip search" her instead of security.
>
> 3.   Mark Miller made an inappropriate comment after
>       hearing that Mrs. Steele's mother was re-marrying,
>       to the effect that "she just probably wants to have
>       bigger and better sex."
>
> 4.   Mrs. Steele stated that Bob Hudson had told her
>       employees were making remarks about her seeing him
>       away from the Hospital.

As noted above, Mr. Jackson decided not to investigate these
incidents.

On July 29, 1994, Mr. Jackson, along with Mary Sue Berry,
conducted a seminar on sexual harassment for the plant operations
department.   Most of the plant department employees interviewed
described the training as beneficial.   Several commented they had
a much better understanding of what constitutes harassment.   Two of
the interviewees were critical of Mr. Jackson's attitude toward the
training.   They interpreted certain of his comments as evidencing
an insincere attitude.   Specifically, they stated Mr. Jackson's
comments that they should not worry, no one was going to be
disciplined, meant that the Hospital did not take the problem
seriously but was conducting the training because it was something
that had to be done.

Following this seminar, Mrs. Steele did not raise any
additional complaints of sexual harassment until her attorney's
letter was received by Mr. Brown in the corporate legal department.

In sum, until the interviews I conducted last week, no
one has ever spoken individually with any individual accused of
sexual harassment and no one, other than Mr. Falke, has been
counseled regarding their conduct.

IV.  Summary of Interviews

Set out below is a description of each complaint of
sexual harassment that has been raised by Mrs. Steele to date
together with the results of my investigation. I will address the
allegations concerning specific individuals first and then the
general allegations.

Philip G. Davis, Esq.                                    October 3, 1994
National Medical Enterprises                                    Page 10

1.   <u>Carmen Festa</u>

Mrs. Steele alleges on July 23, 1994, a co-worker told her that Carmen Festa routinely refers to her as "the cunt" in front of a lot of people.

Mr. Festa admitted that on one occasion he may have called Mrs. Steele by this name but could not specifically recall. He denied ever referring to Mrs. Steele as an "asshole" or "fucking bitch".

Mr. Hudson confirmed he had heard Mr. Festa refer to Mrs. Steele as a "cunt". He stated this occurred when Mr. Festa was responding to a radio call and said out loud, "I wonder what that cunt wants now." Mr. Hudson stated that he told Mr. Festa he was going to get in trouble and advised him to "lay low on it". Mr. Hudson stated this was the only time he had heard Mr. Festa use this term in reference to Mrs. Steele. Mr. Hudson stated he had not heard Mr. Festa (or any other department employee) refer to Mrs. Steele in a derogatory way other than on this one occasion.

Mr. Hansen and Mr. Ladd confirmed that Mr. Festa refers to Mrs. Steele as a "cunt" and also uses other derogatory terms such as "fucking bitch" and "asshole" usually after learning that she has made a complaint or done something he dislikes.

Everyone else interviewed denied having heard Mr. Festa use this language in reference to Mrs. Steele.

2.   <u>Don Deming</u>

Mrs. Steele alleges that in mid February of 1994, she went to the mechanical room looking for a blank Daily Work Sheet because she could not find one in the office area. She claims several men were in the mechanical room including Bob Hudson and Don Deming.[5] She claims Mr. Deming told Mrs. Steele he had a work sheet in his locker. He called Mrs. Steele over to his locker and opened the door. On the inside of the door at eye level was a hugh caricature of extended male genitalia. Mrs. Steele claims she took the work sheet and pretended not to notice the drawing. As she walked out, she claims she heard the men snickering.[6]

---

[5]   To date, these men have not been identified by Mrs. Steele.

[6]   This particular description of the incident is taken from her attorney's letter. The description of the event contained in her March 26th letter to the Ethics Committee is not as detailed.

Philip G. Davis, Esq.                              October 3, 1994
National Medical Enterprises                             Page 11

        I was unable to confirm this incident. Mr. Deming was on
vacation and I was not able to interview him. Mr. Hudson stated he
never saw the caricature and does not recall Mrs. Steele coming
into the mechanical room looking for a work sheet. He had no
knowledge of the incident.

        No one else interviewed had ever seen the drawing. No
one from Hospital management has ever examined Mr. Deming's locker.
I was told by one interviewee that Mr. Deming's locker is on the
ground level and when the door is opened, it would not be at eye
level. I did not have an opportunity to examine the locker while
at the Hospital. The location of his locker should be verified.

        3.   <u>Craig Snyder</u>

        Mrs. Steele alleges Craig Snyder handed her a piece of
paper and sat down in front of her while she began to read it. The
typewritten page contained a vulgar joke. Mrs. Steele claims she
told Mr. Snyder she did not think it was funny and she was going to
show it to her husband and see what he thought of Mr. Snyder's
giving it to her.

        Mr. Snyder admitted giving Mrs. Steele a copy of the
joke. He denied her version of the event. He stated he handed her
the joke and she said she would read it if she had time when she
was not busy. Mr. Snyder stated Mrs. Steele never indicated she
was offended by the joke and, further, he did not intend to offend
her.

        No one else interviewed had ever seen the joke.

        4.   <u>Mark Miller</u>

        My investigation of the allegations concerning Mr. Miller
was significantly impacted by the fact that Mr. Miller refused to
meet with me unless I agreed to his tape recording our meeting or
allowed him to have his attorney present. When I refused to agree
to either demand, he refused to talk to me.

        There are numerous allegations concerning Mr. Miller. Messrs.
Hansen, Hartrey and Shamro stated they have heard Mr. Miller refer
to Mrs. Steele as an "asshole" and "fucking bitch."

        a.   Mr. Miller told Mr. Hansen he was "tapping" her.

        Mr. Hansen confirmed this. Mr. Ladd stated he had been
told by Mr. Hansen that Mr. Miller had said this.

Philip G. Davis, Esq.                                    October 3, 1994
National Medical Enterprises                                    Page 12

    b.   On May 13, 1994, Mr. Miller was in Mrs. Steele's office with Jim Maschinot and Mrs. Steele when Mr. Miller said that he had been appointed to escort all fired female employees off the premises, take them to a booth at the Pasadena Bar & Grill and thoroughly strip search them.

    I was not able to determine either way whether this incident occurred.[7]

    c.   On May 20, 1994, Mark Miller and Sal Falzone were in Mrs. Steele's office and she mentioned she was going on vacation to visit her 70 year old mother who was getting married. Mr. Miller asked her if her mother was getting married so she could get more sex, to which Mrs.Steele responded she did not appreciate his comment.

    Mr. Falzone denied the incident occurred.

    d.   On July 7, 1994, Mrs. Steele, Mr. Falke and a vendor, Dave Silva, were present in the office when Mr. Miller came in. Mr. Miller asked whether they had heard that, if Michael Jackson continued to molest boys, the Catholic Church was going to give him his own parish. Mr. Falke did not tell him this was inappropriate.

    Mr. Falke vaguely recalled the joke and agrees he probably did not say anything.  He stated he did not really understand the joke and did not view it as sexual harassment.

    e.   On July 25, 1994, Mr. Miller asked Mrs. Steele if she had seen the memo regarding "her-ass-meant" a lot to me?

    Since I was not able to interview Mr. Miller, I was unable to confirm or deny the incident.

    f.   On July 28, 1994, Mrs. Steele was leaving the premises when Mr. Miller observed her telling a co-worker "good bye--see you later at Publix." Mr. Miller asked her if the co-worker was one of her lovers. Miller asked her to join him at the bowling alley.

    I was unable to confirm or deny this incident.

---

    [7]   Jim Maschinot is not a department employee.  I have not identified who he is but this should be done and he should be interviewed.

Philip G. Davis, Esq.                          October 3, 1994
National Medical Enterprises                            Page 13

　　　　5.　　Rick Ladd

　　　　　　Mrs. Steele alleges that Albert Shamro was in her office
when Mr. Ladd came in and proceeded to tell Mrs. Steele "an
extremely vulgar  detailed story concerning bestiality to which
Mrs. Steele responded that's terrible." Mrs. Steele claims Mr.
Shamro totally ignored Mr. Ladd and Mr. Ladd did not respond.[8]

　　　　　　Mr. Ladd denied ever telling such a story.  Mr. Shamro
stated he could not remember Mr. Ladd telling this story but added
Mrs. Steele had recently asked him if he remembered a story about
a dog and peanut butter.  He told her "no".  Mr. Shamro added that
he generally does not pay attention to other people's conversations
when he is in the office.

　　　　6.　 Sal Falzone

　　　　　　There are a number of allegations concerning Mr. Falzone.

　　　　　　a.　 Mrs. Steele claims that Mr. Falzone has made comment
about her sex life.

　　　　　　Messrs. Shamro, Hansen and Hartrey confirmed overhearing
Mr. Falzone boast of a sexual relationship with Mrs. Steele.  When
I asked him whether he had made any such statement, he said "no
way".

　　　　　　These same individuals stated he has made similar boasts
concerning Mrs. Fleiger.  I was told he had boasted that he and
Mrs. Fleiger had danced together at a company function and she had
let him grab her breasts while they were dancing and they had then
gone to a room together.  His response was to laugh and say "no
way--not her, she don't have any breasts, she has cancer."

　　　　　　b.　 Mrs. Steele alleges Mr. Falzone called her on the phone
and said, "Hi, you sexy thing."

　　　　　　Mr. Falzone's response was "no way--why would I say that?
She's too old, I like them younger.  She isn't sexy."

　　　　　　c.　 On May 20, after Mark Miller had left the office,
Mrs.Steele alleges that Mr. Falzone grabbed her by the waist as she
was leaving the office and said, "Don't you ever have any fun?"

─────────────
　　　　[8]　 I believe this incident is described in greater detail in
Mrs. Steele's memo to Mr. Jackson dated July 20, 1994.  A copy of
this memo was attached as exhibit 7 to the August 26 attorney
letter.

Philip G. Davis, Esq.                                    October 3, 1994
National Medical Enterprises                                   Page 14

Mr. Falzone denies the incident ever happened and denies he has ever touched her.

(7)   Joe Modesitt

Mrs. Steele alleges that on one occasion, when she complained to Mr. Falke about an inappropriate remark made by Mr. Modesitt, Mr. Falke told her not to try and get an apology because his wife worked in human resources and Mrs. Fleiger would "work the system" against Mrs. Steele and she might not get to work at Palms.

I confirmed that an incident involving Mr. Modesitt and Mrs. Steele had occurred some time ago.  The incident did not concern sexual harassment.  Mr. Falke denies making the statements attributed to him.

8.   Bob Hudson

Mr. Hudson denied telling Mrs. Steele employees were making remarks about her seeing him away from the Hospital.

General allegations of harassment.

1.   Mrs. Steele alleges she is often referred to in derogatory terms such as "asshole" and "fucking bitch".

As noted above, I did confirm that Messrs. Festa and Miller have referred to Mrs.Steele in a derogatory manner.  I was also told by Messrs. Hansen, Hartrey and Shamro that others speak of her in this fashion but they refused to identify anyone else.

2.   Mrs. Steele alleges on March 14, 1994, she went to the mechanical room to get coffee and found a cartoon concerning sexual harassment on the bulletin board.  The only interviewee who confirmed seeing the cartoon was Mr. Hansen.  He told me that he gave the cartoon to Mrs. Steele.  The August 26 attorney letter states that Mrs. Steele later went back to the mechanical room and removed the cartoon.

Mr. Falke denied ever seeing the cartoon.

3.   Mrs. Steele alleges remarks are often made about her sex life.

The interviews confirmed that Messrs. Miller and Falzone have made comments about her sex life.  Whether these remarks can be characterized as happening "often" is debatable.

Philip G. Davis, Esq.                                    October 3, 1994
National Medical Enterprises                                    Page 15

    4.  During Hospital Week, the Hospital was giving out stadium cushions.  Two employees came into the office to get their cushions and one said to her "you sexy thing."

    Each person interviewed denied making this statement.

**V.**   <u>General Observations and Conclusions</u>

    **A.**   <u>Evidence of a Sexually Hostile Environment</u>

    The investigation did confirm a number of the incidents. With respect to the incidents involving the posting of sexually offensive material in the workplace, this has been addressed by the Hospital and all such material has been removed.  I do not believe this was as pervasive a problem as Mrs. Steele suggests.

    Likewise, the investigation confirmed Mr. Snyder did give Mrs. Steele the "vulgar" written joke even though he disputes what was said.  There is no evidence that Mr. Snyder has engaged in other inappropriate conduct and I do not believe he will repeat such conduct in the future.  Nonetheless, it would be appropriate to counsel him regarding this incident.

    The behavior of Messrs. Festa, Falzone and Miller is of the greatest concern.  The investigation confirmed Mr. Festa has referred to Mrs. Steele using a particularly offensive term.  It also appears that Mr. Miller has used similar inappropriate language.  My sense is that others in the department may have as well.  Mrs. Steele is clearly not liked by the majority of men working in the department. With respect to the other allegations concerning Mr. Miller, I was not able to verify these incidents occurred.  However, his refusal to meet with me certainly does not help his case.  Also, he was described to me by a number of the interviewees as a vulgar individual, capable of this type of behavior. Lastly, Mr. Falzone is most definitely a problem.  Had I chosen to be offended during our interview, I would have been by the nature of his remarks and his obvious lack of respect for women.  Frankly, Mr. Falzone is so unenlightened about the appropriate attitude one should have towards the opposite sex it is difficult to take him seriously.  I imagine that most women would simply ignore him.  Still, his behavior creates the potential for liability given the subjective nature of sexual harassment claims. Some form of disciplinary action should be taken with respect to each of these employees.

Philip G. Davis, Esq.                                October 3, 1994
National Medical Enterprises                                 Page 16

### B.   Evidence of a Sexually Discriminatory Environment

Separate and apart from Mrs. Steele's complaints of a sexually hostile environment, there is evidence to suggest that the work environment for women in this department is discriminatory.

There is a history of complaints of sex discrimination against Mr. Falke by the women who have held the secretary position in this department.

In 1989, Vicky Weekly, the department secretary, complained about Mr. Falke.  Among other things, Ms. Weekly complained that Mr. Falke makes crude comments about women and women's products at department meetings.  She also complained about two crude jokes he had told.  Additionally, she felt that after she had complained to him about her evaluation, he began a campaign to get rid of her. Enclosed with this letter as Exhibit "F" is a file memorandum prepared by Mrs. Fleiger documenting part of her investigation of this matter. It also evidences that many of the complaints about this department that surfaced in my interviews were being voiced as long ago as 1989.

There is no record of any disciplinary action being taken against Mr. Falke as a result of these complaints.  Instead, several months later, Mrs. Weekly was terminated after she was overheard criticizing Mr. Falke and the Environmental Services Director.  The reason given on the papers documenting her termination was "undermining management". See Exhibit "D".

I do not believe that Mrs. Weekly's termination is an exceptional case.  Repeatedly during the interviews I was told that the Hospital's response to employees who complain is to cover up the problem and find a reason to terminate the employee.  Moreover, when employees complain, they are frequently cautioned by the Hospital Administration and Human Resources that they had better be able to prove their accusations.  Otherwise, they are told they can be sued for libel.  This type of response has had a chilling effect on employees' willingness to bring complaints to the attention of management.  One reason I had difficulty obtaining the cooperation of several of the interviewees was their concern that if they could not prove what they had seen or heard, they would be sued for libel.

I also interviewed Sheila Ginsley, the department secretary prior to Mrs. Steele.  Mrs. Ginsley told me she thought Mr. Falke had treated her in a sexually discriminatory manner.  She was not treated with respect.  She found him condescending and felt he looked on women as if they were beneath him.  She transferred out of the department the first opportunity she had.

Philip G. Davis, Esq.                                    October 3, 1994
National Medical Enterprises                                     Page 17

### C.   Evidence of the Hospital's Hostility to Employee Complaints

As noted above, I was repeatedly told during the interviews that the Hospital will find a way to get rid of any employee who complains about management.   The treatment of Ms. Weekly seems to corroborate that this may well be true.   This hostility towards employees who complain was also evidenced through comments made by Mr. Patterson and Ms. Fleiger during their interviews.

At the conclusion of my interviews on September 19, I told Mr. Patterson I had found some corroboration for Mrs. Steele's complaints.   He seemed genuinely surprised.   The impression I had from his reaction was it had never occurred to him that her complaints might be legitimate.   Instead, his attitude has been to view Mrs. Steele as the problem.   Mr. Patterson has regarded her with suspicion, believing that her actions are calculated for litigation.

This same attitude is prevalent in the Human Resources Department.   During my interview with Ms. Fleiger, she confided in me that she regards Mr. Falke as a weak manager.   As an example of his weakness as a manager, she related her displeasure that Mr. Falke had disregarded her advice and allowed Mrs. Steele to work on Memorial Day without supervision.   Mrs. Fleiger told me she had instructed Mr. Falke "not to let that woman work alone" because she did not want Mrs. Steele working unsupervised since she might counsel other employees on how to file complaints against the Hospital.

I did not observe any greater interest in Mrs. Steele's complaints exhibited by Mr. Jackson.   Perhaps he was taking his cue from the local Hospital management.   In any event, he clearly did not seek to independently investigate Mrs. Steele's complaints and, by his comments, he created the impression that Mrs. Steele's complaints were "no big deal."

### D.   The Leadership Vacuum

An unintended result of these interviews was the revelation that there is a serious leadership vacuum at Palms of Pasadena.   Mr. Paterson does not appear to be viewed favorably.   I was told if I interviewed the Directors, and if I could persuade them to trust me, I would find a high level of dissatisfaction with Mr. Patterson.   I was told that he is not a "people person".   He has insulated himself from interacting with employees in the Hospital. He is generally viewed as being only concerned with the bottom line and not with patient care. I was told that morale has never been as

Philip G. Davis, Esq.                          October 3, 1994
National Medical Enterprises                          Page 18

low as it is now.  Given the limited sampling of the interviews I
conducted,  I  hesitate  to  draw  broad  conclusions  about  Mr.
Patterson.   Nonetheless,  my  strong  impression  after  meeting  Mr.
Patterson and assessing the interviewee's sincere concern that he
not be informed of the content of these interviews, leads me to
believe that his performance as Chief Executive Officer should be
more closely examined.

     With respect to the Plant Operations Department, Mr.
Falke does not have credibility with any employee working in this
department. He is viewed as being more interested in his own career
than in the welfare of his department.  He has not been able to
assert  control  over  the  Department  in  a  positive  way  and,
consequently, the employees in the Department are deeply divided
and  harbor  antagonistic  feelings  towards  one  another.   Mrs.
Steele's complaints are simply one aspect of the problem.

     The  problems  in  the  Department  date  back  at  least  to
1988, shortly after Mr. Falke was hired.[9] This is evidenced by the
earlier discussion of the Weekly matter.  Additionally, I was told
during my interview with Ms. Ginsley, that shortly before her
transfer from the plant operations department, all of the employees
in this department had complained to the Administration about Mr.
Falke.   In response, Mr. Schlagheck met individually with each
employee in the department to hear their complaints.  One of the
issues raised had to do with Mr. Falke's honesty and the perception
that he was receiving kickbacks from some of the contractors.
After meeting with Mr. Schlagheck, the employees felt that he had
really listened to them and they were optimistic that changes would
be made.  When nothing happened, they concluded that the Hospital
is not interested in listening to employee complaints but instead
wants only to "cover up" the problems and get rid of the
complaining employees.[10]

     On a positive note, Mr. Bonk, the new Chief Operating
Officer, has responsibility for management of the plant operations
department.   Mr. Bonk impressed me as being a person genuinely
interested in employees.  He also has reportedly made a favorable

─────────────

     [9]  I believe Mr. Falke was hired during the union organizing
drive.  Since union activity is usually symptomatic of employee
relations issues, it is quite possible the problems in this
department go further back in time.

     [10]  Although this is the perception, with respect to this
particular event, I was not provided with any information that any
employees were terminated as a result of information provided
during these interviews.

Philip G. Davis, Esq.                                    October 3, 1994
National Medical Enterprises                                    Page 19

first impression.  I recommend that he be directed to independently
assess Mr. Falke and, if his investigation confirms my findings, it
would seem that termination of Mr. Falke's employment should be
considered.  Having made this recommendations, you should be aware
his most recent performance evaluation is very positive.
Significantly, his May counseling is _not_ reflected in his
evaluation.   A copy of Mr. Falke's most recent evaluation is
enclosed as Exhibit "G".

VI.   Conclusion

        Mrs. Steele's complaints are not without some basis in
fact.  While I do not believe sexual harassment is pervasive in
this department, some form of credible disciplinary action should
be undertaken against the primary offenders.  At the same time,
care needs to be taken to continue to educate the employees working
in this department that complaints like those made by Mrs. Steele
are legitimate.  Currently, she is viewed as the problem, not the
conduct that prompted her to complain.

        Second, steps should be taken to improve the manner in
which sexual harassment complaints are investigated.  I realize the
ethics action Line was not intended to be the vehicle for receiving
and investigating sexual harassment complaints.  Nonetheless, and
as a practical matter, the Ethics Action Line will continue to
receive these types of complaints, particularly in circumstances
where the complaining party does not feel comfortable complaining
to local management.  Consequently, it is important to put in place
mechanisms that will ensure a more prompt response.

        Third, the response from Regional Human Resources was, in
our view, inadequate.  Mrs. Steele provided Mr. Jackson with four
instances of sexual harassment, in addition to those she had
complained about to the Ethics Action Line.   In doing so, she
identified three individuals she claimed had engaged in acts of
harassment.   These individuals should have been interviewed and
appropriate disciplinary action should have been administered.  By
acting promptly and decisively, Regional Human Resources would have
better reinforced the Hospital's policy prohibiting sexual
harassment.

        Lastly, we recommend a broader investigation of the
employee relations environment at Palms of Pasadena.  We are
concerned the problems revealed through these interviews may extend
beyond the plant operations department.

JACKSON, LEWIS, SCHNITZLER & KRUPMAN

Philip G. Davis, Esq.                                    October 3, 1994
National Medical Enterprises                                    Page 20


        After you have had an opportunity to review this letter
and supporting documents, please call me so I may answer any
questions you may have.

                          Cordially,

              JACKSON, LEWIS, SCHNITZLER & KRUPMAN



                     Diane E. Stanton

DES:cg
Enclosures

[DES02988.ltr]

File:      NME / Steele Matter

**PALMS OF PASADENA HOSPITAL**

**EVALUATION NOTIFICATION**
**(To Be Returned With Completed Evaluation)**

**EMPLOYEE NAME:** Leona Steele

**DEPARTMENT:** Plant Oper

**POSITION:** Secretary II

### REASON FOR RENDERING NOTIFICATION

| | |
|---|---|
| _____X_____ Annual | Effective Date__10/18/93__ |
| _____Merit | Effective Date_____ |
| _____Promotion | Effective Date_____ |
| _____End of Probation | Effective Date_____ |

**DATE OF HIRE_____10/12/92__     LAST REVIEW DATE_____**

**ANNUAL REVIEW DATE _____10/18/93__  PURPOSE_____**

### SALARY INFORMATION

**PRESENT SALARY** $7.93       **RECOMMENDED SALARY** $ 8.25   ✓

**GRADE/STEP** 12/18         **GRADE/STEP** 12 / 22   ✓

               **PERCENT OF INCREASE** ___4___ %   ✓

**Recommended by:** _____ _____
                              (Signature)          (Title) Director

**Reviewed by:** _____
                 (Administrative Director/Human Resources)

**Approved by:** _____
                 (Administrator and/or Asst. Administrator

EVAL 9/9/92



## PERFORMANCE EVALUATION

Employee Name: __Leona Steele__    Social Security Number: __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__

Department: __Plant Operations__    Position Title: __Department Head Secretary__

Position Number: __C76__    Annual Review Date: __10/12__

Reason for Rendering Report:

> Annual Review __x__
> Merit _____
> Promotion _____
> End of Probation ____

OCT 2 2 1993

Date of Hire: __10/12/92__    Last Review Date: __1/12/93__

Annual Review Date: __10/12/93__    Purpose: __Annaul Peview__

SCALE:  5= Well Above Standard    4= Above Standard    3= Meets Standard

2= Below Standard    1= Well Below Standard

| I. | DESCRIPTION OF RESPONSIBILITIES | ANNUAL RATING |
|---|---|---|
| a. | Maintains department Work Order Controller, coordinating work orders as they come in, compiling reports,  PM's on equipment. | 5 |
| b. | Reports problems relating to the staffing, work methods and procedures to the Director of Plant Operations. | 5 |
| c. | Orders office supplies and equipment. | 5 |
| d. | Prepares reports and correspondence as requested by Director. | 5 |
| e. | Assists the Director in compiling data for capital equipment requests for hospital projects. | 5 |
| f. | Maintains an accurate filing system for inter-departmental memos, reports, letters, purchase orders, preventive maintence and other department related paperwork. | 5 |
| g. | Coordinates preparation of inventory and maintains records of the | 5 |

(Cont.)

**Note:** Results from attached page. Number of line items (____) Total  **35**

TOTAL  **70**

**PERFORMANCE EVALUATION**

# DESCRIPTION OF RESPONSIBILITIES/TASKS (Continued)

ANNUAL
RATING

of the inventory.  Advises the Director of any problems.

Maintains personnel files and attendance records.

5

Maintains all Fire and Safety, Infection Control, Safety Committee and

Departmental Meeting manuals as required.

5

Answers telephones, takes messages, and directs calls.

5

Assist the Director with proposals, quotations and specifications from

vendors and contractors.

5

Responsible for incoming and outgoing mail.

5

Handles telephone requests from Physicians Offices in the Medical Office

Building and refers to technician on duty.

5

Performs other duties as requested by Director.

5

## COMMENTS SECTION

**RESPONSIBILITIES/TASKS:**

Lee has performed her responsibility as Department Head Secretary with the utmost of professionalism and effectiveness. There is no task or assignment that is given to Lee that is not carried out with proficiency and accuracy. In these last 12 months Lee has proven herself as an asset to this department and hospital.

**PERFORMANCE FACTORS:**

Lee's performance exceeds standards. When recently ask to take over as Safety Committee Secretary, Lee eagerly accepted, and has done an outstanding job.

**GOALS:**

Continue to work on special projects for the Safety Committee; i.e, educational tracking, policy/procedure compliance, Safety Survey documentation, A.D.A. reports.

**EMPLOYEE'S COMMENTS:**

I have enjoyed as well as learned from my first year in Plant Operations. I feel I am given every opportunity available for growth and development of my skills.

## II.  DESCRIPTION OF PERFORMANCE FACTORS

ANNUAL
RATING

|      |                                          |     |
|------|------------------------------------------|-----|
| 1.   | Appearance                               | 5   |
| 2.   | Attendance                               | 5   |
| 3.   | Compliance with Policies                 | 5   |
| 4.   | Confidentiality                          | 5   |
| 5.   | Cooperation                              | 5   |
| 6.   | Cost Awareness                           | 5   |
| 7.   | Loyalty to the Organization              | 5   |
| 8.   | Patient/Visitor/Employee/Physician Awareness | 5 |
| 9.   | Punctuality                              | 5   |
| 10.  | Safety                                   | 5   |
| 11.  | Initiative                               | 5   |
| 12.  | _____                       | __  |
| 13.  | _____                       | __  |
| 14.  | _____                       | __  |
| 15.  | _____                       | __  |

TOTAL   55

## III. SUMMARY

ANNUAL
RATING

Completion Instructions
Total Points from Section I ÷ Number of Line Items =          5.0
Total Points from Section II ÷ Number of Line Items =         5.0
Add the two above totals together =                          10.0
Divide the total by two (2) =                                 5.0
Performance Evaluation Rating

## IV. ANNUAL REVIEW

Date: _10-20-93_          Employee Signature: _Lee Steeb_

Evaluator Signature: _____

Department Head Signature: _____

Personnel Director's Signature: _____

Administrator/Assistant Administrator Signature: ___

# PALMS OF PASADENA HOSPITAL

## PERFORMANCE EVALUATION

**Employee Name:** Leona Steele          **Social Security Number:** 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

**Department:** Plant Operations          **Position Title:** Department Head Secretary

**Position Number:** C76          **Annual Review Date:** 10/12

**Reason for Rendering Report:**

Annual Review ___x___
Merit _____
Promotion _____
End of Probation ____

**Date of Hire:** 10/12/92          **Last Review Date:** 1/12/93

**Annual Review Date:** 10/12/93          **Purpose:** Annaul Review

**SCALE:** 5= Well Above Standard    4= Above Standard    3= Meets Standard

2= Below Standard        1= Well Below Standard

## I.  DESCRIPTION OF RESPONSIBILITIES

|  |  | ANNUAL RATING |
|---|---|---|
| a. | Maintains department Work Order Controller, coordinating work orders as they come in, compiling reports, PM's on equipment. | 5 |
| b. | Reports problems relating to the staffing, work methods and procedures to the Director of Plant Operations. | 5 |
| c. | Orders office supplies and equipment. | 5 |
| d. | Prepares reports and correspondence as requested by Director. | 5 |
| e. | Assists the Director in compiling data for capital equipment requests for hospital projects. | 5 |
| f. | Maintains an accurate filing system for inter-departmental memos, reports, letters, purchase orders, preventive maintence and other department related paperwork. | 5 |
| g. | Coordinates preparation of inventory and maintains records of the | 5 |

(Cont.)

**Note: Results from attached page. Number of line items (_____)**  **Total** 35
**TOTAL** 70

**PERFORMANCE EVALUATION**

# DESCRIPTION OF RESPONSIBILITIES/TASKS (Continued)

**ANNUAL RATING**

of the inventory.  Advises the Director of any problems.

j.   Maintains personnel files and attendance records.  _5_

k.   Maintains all Fire and Safety, Infection Control, Safety Committee and  _5_

Departmental Meeting manuals as required.

l.   Answers telephones, takes messages, and directs calls.  _5_

m.   Assist the Director with proposals, quotations and specifications from  _5_

vendors and contractors.

n.   Responsible for incoming and outgoing mail.  _5_

o.   Handles telephone requests from Physicians Offices in the Medical Office  _5_

Building and refers to technician on duty.

p.   Performs other duties as requested by Director.  _5_

## II. DESCRIPTION OF PERFORMANCE FACTORS

ANNUAL RATING

| | | |
|---|---|---|
| 1. | Appearance | 5 |
| 2. | Attendance | 5 |
| 3. | Compliance with Policies | 5 |
| 4. | Confidentiality | 5 |
| 5. | Cooperation | 5 |
| 6. | Cost Awareness | 5 |
| 7. | Loyalty to the Organization | 5 |
| 8. | Patient/Visitor/Employee/Physician Awareness | 5 |
| 9. | Punctuality | 5 |
| 10. | Safety | 5 |
| 11. | Initiative | 5 |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |

TOTAL  55

## III. SUMMARY

ANNUAL RATING

Completion Instructions
Total Points from Section I ÷ Number of Line Items =    5.0
Total Points from Section II ÷ Number of Line Items =    5.0
Add the two above totals together =    10.0
Divide the total by two (2) =    5.0
Performance Evaluation Rating

## IV. ANNUAL REVIEW

Date: 10-20-93          Employee Signature: _____

Evaluator Signature: _____

Department Head Signature: _____

Personnel Director's Signature: _____

Administrator/Assistant Administrator Signature: _____

## COMMENTS SECTION

**RESPONSIBILITIES/TASKS:**

Lee has performed her responsibility as Department Head Secretary with the utmost of professionalism and effectiveness. There is no task or assignment that is given to Lee that is not carried out with proficiency and accuracy. In these last 12 months Lee has proven herself as an asset to this department and hospital.

**PERFORMANCE FACTORS:**

Lee's performance exceeds standards. When recently ask to take over as Safety Committee Secretary, Lee eagerly accepted, and has done an outstanding job.

**GOALS:**

Continue to work on special projects for the Safety Committee; ie, educational tracking, policy/procedure compliance, Safety Survey documentation, A.DA. reports.

**EMPLOYEE'S COMMENTS:**

I have enjoyed as well as learned from my first year in Plant Operations. I feel I am given every opportunity available for growth and development of my skills.

## PERFORMANCE EVALUATION

**Employee Name:** Leona T. Steele     **Social Security Number:** 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

**Department:** Plant Operations     **Position Title:** Department Head Secretary

**Position Number:** _____     **Annual Review Date:** _____

**Reason for Rendering Report:**

Annual Review _____
Merit _____
Promotion _____
End of Probation __x__

JAN 2 9 1993

**Date of Hire:** October 12, 1992     **Last Review Date:** _____

**Annual Review Date:** _____     **Purpose:** _____

**SCALE:  5= Well Above Standard     4= Above Standard     3= Meets Standard**

**2= Below Standard          1= Well Below Standard**

## I.  DESCRIPTION OF RESPONSIBILITIES

|  | | ANNUAL RATING |
|---|---|---|
| a. | Maintains department Work Order Controller, coordinating work orders as they come in, compiling reports,  PM's on equipment. | 5 |
| b. | Reports problems relating to the staffing, work methods and procedures to the Director of Plant Operations. | 5 |
| c. | Orders office supplies and equipment. | 5 |
| d. | Prepares reports and correspondence as requested by Director. | 5 |
| e. | Assists the Director in compiling data for capital equipment requests for hospital projects. | 5 |
| f. | Maintains an accurate filing system for inter-departmental memos, reports, letters, purchase orders, preventive maintence and other department related paperwork. | 5 |
| g. | Coordinates preparation of inventory and maintains records of the | 5 |

(Cont.)

**Note: Results from attached page. Number of line items ( 14 ) Total     TOTAL     35**

Case 8:00-cv-00052-JSM   Document 48   Filed 01/18/00   Page 35 of 71 PageID 520

## DESCRIPTION OF RESPONSIBILITIES/TASKS (Continued)

ANNUAL
RATING

of the inventory.  Advises the Director of any problems.

| Maintains personnel files and attendance records. | 5 |

Maintains all Fire and Safety, Infection Control, Safety Committee and

Departmental Meeting manuals as required.

5

Answers telephones, takes messages, and directs calls.

5

Assist the Director with proposals, quotations and specifications from

vendors and contractors.

5

Responsible for incoming and outgoing mail.

5

Handles telephone requests from Physicians Offices in the Medical Office

Building and refers to technician on duty.

5

Performs other duties as requested by Director.

5

35

## COMMENTS SECTION

**RESPONSIBILITIES/TASKS:**

_____

_____

_____

_____

_____

_____

**PERFORMANCE FACTORS:**

_____

_____

_____

_____

_____

_____

**GOALS:**

_____

_____

_____

_____

_____

_____

**EMPLOYEE'S COMMENTS:**

I enjoy my position in Plant Ops. Its a
Great department and I feel I am contributing
in an important area, and look forward to
a long, happy association

## II.  DESCRIPTION OF PERFORMANCE FACTORS

**ANNUAL RATING**

| | | |
|---|---|---|
| 1. | Appearance | 5 |
| 2. | Attendance | 5 |
| 3. | Compliance with Policies | 5 |
| 4. | Confidentiality | 5 |
| 5. | Cooperation | 5 |
| 6. | Cost Awareness | 5 |
| 7. | Loyalty to the Organization | 5 |
| 8. | Patient/Visitor/Employee/Physician Awareness | 5 |
| 9. | Punctuality | 5 |
| 10. | Safety | 5 |
| 11. | Initiative | 5 |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |

**TOTAL** 55

## III. SUMMARY

**ANNUAL RATING**

Completion Instructions
Total Points from Section I ÷ Number of Line Items =   5.0
Total Points from Section II ÷ Number of Line Items =   5.0
Add the two above totals together =   10
Divide the total by two (2) =   5.0
Performance Evaluation Rating

## IV. ANNUAL REVIEW

Date: 1|15|93       Employee Signature: _Leona Steb_

Evaluator Signature: _____

Department Head Signature: _____

Personnel Director's Signature: _Jill Fleisher_

Administrator/Assistant Administrator Signature: _Joseph Hagueve_

# STEELE v. TENET HEALTHCARE CORPORATION

## PRIVILEGE LOG FOR RULE 45 SUBPOENA TO IASIS HEALTHCARE (Palms of Pasadena)

| DOCUMENT | DATE | TO | FROM | SUBJECT | PRIVILEGE |
|---|---|---|---|---|---|
| Bates No. 182 Memo | 10/16/95 | P. Davis, Esq. | Ron Robinson | Telephone call from Lee Steele | Attorney-client |
| Bates No. 191 Fax Message | 10/24/95 | J. Brown, Esq. | D. Park | L. Steele | Attorney-client |
| Bates Nos. 198-201 Fax Coversheet and Messages | 10/25/95 | J. Brown, Esq. | D. Park | L. Steele | Attorney-client |
| Bates Nos. 203-204 Fax and memo | 10/25/95 | D. Park | J. Brown, Esq. | L. Steele | Attorney-client |
| Bates Nos. 212-213 Fax and memo | 10/26/95 | D. Park J. Schlagheck | J. Brown, Esq. | L. Steele | Attorney-client |
| Bates Nos. 215-216 Fax Coversheet and Message | 10/26/95 | J. Brown, Esq. | D. Park | L. Steele | Attorney-client |
| Bates Nos. 232-233 Fax Coversheet and Message (233 Dup) | 10/27/95 | P. Davis, Esq. | D. Park | L. Steele | Attorney-client |
| Bates No. 273 Memo | 11/03/95 | File | J. Brown, Esq. | L. Steele | Attorney-client Work Product Doctrine |
| Bates No. 275-276 Fax message | 11/03/95 | P. Davis, Esq. | D. Park | L. Steele | Attorney-client |
| Bates No. 462 Fax Message | 03/05/96 | J. Brown, Esq. | D. Park | L. Steele | Attorney-client |



| DOCUMENT | DATE | TO | FROM | SUBJECT | PRIVILEGE |
|---|---|---|---|---|---|
| Bates No. 466 Fax Message | 03/06/96 | J. Brown, Esq. | D. Park | | Attorney-client |
| Bates No. 467 Fax Message | 03/07/96 | J. Brown, Esq. | D. Park | | Attorney-client |
| Bates No. 468 Fax Message | 03/07/96 | P. Davis, Esq. | D. Park | L. Steele | Attorney-client |
| Bates Nos. 470-472 Fax Message and Memo | 03/11/96 | D. Bonk | P. Zinober, Esq. J. Brown, Esq. | L. Steele | Attorney-client |
| Bates Nos. 504-507 Fax Message Sheet and Letters | 04/10/96 | D. Bonk | J. Brown, Esq. | L. Steele | Attorney-client |
| Bates No. 508 Fax Message | 04/15/96 | J. Brown, Esq. | D. Park | L. Steele | Attorney-client |
| Bates No. 510 Memo | 04/18/96 | File | J. Brown, Esq. | L. Steele | Attorney-client and work product doctrine |
| Bates Nos. 511-512 Memo | Undated | File | J. Brown, Esq. | L. Steele | Attorney-client/work product doctrine |
| Bates No. 513 Memo | 04/18/96 | File | J. Brown, Esq. | L. Steele | Attorney-client/work product doctrine |

2

| DOCUMENT | DATE | TO | FROM | SUBJECT | PRIVILEGE |
|---|---|---|---|---|---|
| Bates No. 514 Letter | 04/26/96 | D. Bonk | J. Brown, Esq. | L. Steele | Attorney-client |
| Bates No. 629 Letter | 02/27/97 | D. Park | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 631 Letter | 04/06/99 | D. Park | C. May, Esq. | L. Steele | Attorney-client |
| Bates No. 743 Fax Message | 02/02/99 | C. May, Esq. | J. Fleiger | L. Steele | Attorney-client |
| Bates No. 755 Letter | 05/18/98 | D. Jaqua, Esq. | P. Zinober, Esq. | L. Steele | Attorney-client |
| Bates No. 757 Letter | 05/18/98 | D. Jaqua, Esq. | P. Zinober, Esq. | L. Steele | Attorney-client |
| Bates Nos. 758-760 Letter | 05/18/98 | D. Jaqua, Esq. | P. Zinober, Esq. | L. Steele | Attorney-client |
| Bates No. 761 Letter | 05/20/98 | D. Jaqua, Esq. | P. Zinober, Esq. | L. Steele | Attorney-client |
| Bates Nos. 765-766 Letter | 05/18/98 | D. Jaqua, Esq. | P. Zinober, Esq. | L. Steele | Attorney-client |
| Bates No. 776 Memo | 04/21/97 | J. Bartlett | P. Davis, Esq. | L. Steele | Attorney-client |

3

| DOCUMENT | DATE | TO | FROM | SUBJECT | PRIVILEGE |
|---|---|---|---|---|---|
| Bates No. 777 Letter | 04/03/97 | P. Davis, Esq. | P. Zinober, Esq. | L. Steele | Attorney-client |
| Bates No. 783 Letter | 02/23/97 | J. Fleiger | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 805 Fax Message | 01/23/96 | J. Fleiger | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 810 Fax Message | 01/15/96 | J. Fleiger | J. Brown, Esq. | L. Steele | Attorney-client |
| Bates No. 937 Fax Message | 01/23/96 | J. Fleiger | J. Brown, Esq. | L. Steele | Attorney-client |
| Bates No. 943 Letter | 03/11/96 | J. Fleiger | J. Brown, Esq. | L. Steele | Attorney-client |
| Bates Nos. 951-952 Letter | 04/10/96 | D. Bonk | J. Brown, Esq. | L. Steele | Attorney-client |
| Bates No. 953 | 04/26/96 | D. Bonk | J. Brown, Esq. | L. Steele | Attorney-client |
| Bates No. 958 Fax Message | 08/06/96 | J. Brown, Esq. | J. Fleiger | L. Steele | Attorney-client |
| Bates No. 977 Fax Message | 01/29/97 | J. Brown, Esq. | J. Fleiger | L. Steele | Attorney-client |

4

| DOCUMENT | DATE | TO | FROM | SUBJECT | PRIVILEGE |
|---|---|---|---|---|---|
| Bates No. 980 Letter | 06/28/96 | J. Brown, Esq. | J. Fleiger | L. Steele | Attorney-client |
| Bates No. 981 Letter | 07/11/96 | J. Fleiger | J. Brown, Esq. | L. Steele | Attorney-client |
| Bates No. 1011 Letter | 06/05/95 | D. Stanton, Esq. | P. Davis, Esq. | L. Steele | Attorney-client |
| Bates No. 1042 Letter | 10/04/95 | J. Brown, Esq. | J. Fleiger | L. Steele | Attorney-client |
| Bates No. 1043 Letter | 10/10/95 | J. Brown, Esq. | J. Fleiger | L. Steele | Attorney-client |
| Bates No. 1046 Fax Message | 10/25/95 | J. Brown, Esq. | J. Fleiger | L. Steele | Attorney-client |
| Bates Nos. 1125-1144 Letter | 10/03/94 | P. Davis, Esq. | D. Stanton, Esq. | L. Steele | Attorney-client |
| Bates Nos. 1169-1172 Document w/ note from atty | Undated | J. Fleiger | J. Brown, Esq. | L. Steele | Attorney-client |
| Bates No. 1173 Letter | 02/27/97 | D. Albright | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1174 Letter | 02/27/97 | J. Fleiger | Offices of Zinober & McCrea | L. Steele | Attorney-client |

| DOCUMENT | DATE | TO | FROM | SUBJECT | PRIVILEGE |
|---|---|---|---|---|---|
| Bates No. 1175 Letter | 02/27/97 | B. Hudson | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1176 Letter | 02/27/97 | J. Bartlett | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1177 Letter | 02/27/97 | T. Bivins | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1178 Letter | 02/27/97 | S. Cramer | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1179 Letter | 02/27/97 | D. Deming | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1180 Letter | 02/27/97 | C. Festa | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1181 Letter | 02/27/97 | D. Heinz | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1182 Letter | 02/27/97 | B. Irwin | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1183 Letter | 02/27/97 | R. Ladd | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1184 Letter | 02/27/97 | P. LaMonde | Offices of Zinober & McCrea | L. Steele | Attorney-client |

6

| DOCUMENT | DATE | TO | FROM | SUBJECT | PRIVILEGE |
|---|---|---|---|---|---|
| Bates No. 1185 Letter | 02/27/97 | M. Miklos | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1186 Letter | 02/27/97 | M. Miller | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1187 Letter | 02/27/97 | J. Modesitt | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1188 Letter | 02/27/97 | D. Park | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1189 Letter | 02/27/97 | R. Ramos | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1190 Letter | 02/27/97 | J. Scanlon | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1191 Letter | 02/27/97 | J. Schlagheck | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1192 Letter | 02/27/97 | C. Snyder | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1193 Letter | 02/27/97 | T. Vencis | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1194 Letter | 02/27/97 | T. Violette | Offices of Zinober & McCrea | L. Steele | Attorney-client |

7

| DOCUMENT | DATE | TO | FROM | SUBJECT | PRIVILEGE |
|---|---|---|---|---|---|
| Bates No. 1195 Letter | 02/27/97 | M. Willis | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 1196 Letter | 02/27/97 | B. Hudson | Offices of Zinober & McCrea | L. Steele | Attorney-client |
| Bates No. 002315 | 03/06/96 | J. Brown | D. Park | L. Steele | Attorney-client |
| Bates No. 002069A | 02/23/95 | P. Davis | D. Bonk | L. Steele | Attorney-client |

8

000362

**13**
Apparition Day 9 ☺
"1"
Hit the nickel
Judgement Day

**14**
Deposition Day ☺
"2"
Hit the Nickel
Judgement Day
St. Valentine's Day

**15**
Deposition Day ☺
"3"
Hit the dimo Twice
deposition Crumbc G
Judgement Day
"N3×#"2

**20**
Dr. Karn
11' 30 AM
Ken Rood 1/54

**21**
Thyroid evening
12-12:15

**22**

# ABSENCE APPROVAL FORM

**NAME:** _LEONA T. STEELE_                    **DATE** _JANUARY 30, 1996_

**DEPARTMENT:** _PLANT OPERATIONS_        **COST CENTER** _8480_

**REQUESTED TIME OFF :  FROM:** _2/13/96_        **TO:** _2/16/96_

## INCOME REPLACEMENT REQUEST

**CASH PLUS HOURS** _24_                **CASH PLUS DOLLARS** _____
(# of hours or dollars cannot exceed the # of hours or dollars of the regular work schedule)

**RESERVE SICK HOURS:  FROM:** _____        **TO:** _____

**NOTE:  Reserve Sick accrued hours may be taken:**
    **1. After forty (40) consecutive hours of excused absences or**
    **2. After the first day of hospitalization.**

**OLD RESERVE SICK:     FROM:** _____        **TO:** _____

**NOTE:  Old Reserve sick hours may be taken:**
    **1. After reserve sick hours are exhausted**

**EMPLOYEE SIGNATURE:** _Leona T. Steele_        **DATE:** _January 30, 1996_

**SUPERVISOR APPROVAL:** _____        **DATE:** _1-31-96_

**MANAGER USE ONLY**

**RECORDED IN TAPS:** _YES_        **PAY PERIOD:** _2/17/96_
aaf.doc/1/96

DEPARTMENT

DATE SUBMITTED

SUPERVISOR SIGNATURE

PAY PERIOD END DATE

| DATE | BADGE | NAME | DEPT | JOB CODE | IN | OUT | PL | CN | SN | SB | CB | INS | ORI | VHS |
|------|-------|------|------|----------|-----|-----|----|----|----|----|----|-----|-----|-----|

Mark One Per Trans   Enter Hours/Min

LAW OFFICES OF

## ACOSTA & MANN

100 SECOND AVENUE SOUTH
SUITE 901
ST. PETERSBURG, FLORIDA 33701
PHONE (813) 894-4469
FACSIMILE
(813) 823-7608

May 17, 1995

Mr. J. D. Packwood
Director
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Tampa Area Office
501 East Polk Street
Room 1020
Tampa, FL 33602

RE:   **Claimant  :  Lee Steele**
      **Respondent:  Palms of Pasedena Hospital/National Medical**
      **Charge No.:  151950038**

Dear Mr. Packwood:

The charge in the above-captioned case was filed with the EEOC
on October 4, 1994.  Accordingly, more than one-hundred-eighty
(180) days have passed without a determination.  On behalf of my
client, Lee Steele, we wish to request issuance of her "Right to
Sue" notice (LOD) under 42 U.S.C. Section 2000e-5(f)(1) and the
applicable EEOC compliance procedures.

Thank you very much for your assistance.

Sincerely,

Bonita M. Riggens

BMR:cw

cc:  Lee Steele

F

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## NOTICE OF RIGHT TO SUE
*(Issued Upon Request)*

| | |
|---|---|
| **TO:**<br><br>Ms. Lee Steele<br>7209 Boca Ciega Drive #3<br>St. Petersburg, Florida  33701 | **FROM:**<br><br>Equal Employment Opportunity Commission<br>Tampa Area Office<br>501 E. Polk Street, Suite 1020<br>Tampa, Florida  33602 |

☐  On behalf of a person aggrieved whose identity is CONFIDENTIAL (29 C.F.R. 1601.7(a)).

| CHARGE NUMBER:<br>151950038 | EEOC REPRESENTATIVE<br>Sylvia Pouncy, Enforcement Supervisor | TELEPHONE NUMBER<br>(813) 228-2276 |
|---|---|---|

*(See the additional information attached to this form)*

**TO THE PERSON AGGRIEVED:**

This is your NOTICE OF RIGHT TO SUE. It is issued at your request. If you intend to sue the respondent(s) named in your charge, **YOU MUST DO SO WITHIN NINETY (90) DAYS OF YOUR RECEIPT OF THIS NOTICE; OTHERWISE YOUR RIGHT TO SUE IS LOST.**

**X**   More than 180 days have expired since the filing of this charge.

☐   Less than 180 days have expired since the filing of this charge, but I have determined that the Commission will be unable to complete its administrative process within 180 days from the filing of the charge.

**X**   With the issuance of this Notice of Right to Sue, the Commission is terminating its process with respect to this charge.

☐   It has been determined that the Commission will continue to investigate your charge.

☐   ADEA - While Title VII and the ADA require EEOC to issue this Notice of Right to Sue before you can bring a lawsuit, you may sue under the Age Discrimination in Employment Act (ADEA) any time 60 days after your charge was filed until 90 days after you receive notice that EEOC has completed action on your charge. (and for any violations alleged to have occured before the November 21, 1991 effective date of the 1991 Civil Rights Act, any suit should be brought within 2 years of the alleged violation ( 3 years for willfull violations) in order to assure the right to sue.)

☐   Because EEOC is closing your case, your lawsuit under the ADEA must be brought within 90 days of your receipt of this notice. Otherwise, your right to sue is lost.

☐   EEOC is continuing its investigation. You will be notified when we have completed action and, if appropriate, our notice will include notice of right to sue under the ADEA.

☐   EPA - While Title VII and the ADA require EEOC to issue this Notice of Right to Sue before you can bring a lawsuit, you already have the right to sue under the Equal Pay Act (EPA) (you are not required to complain to any enforcement agency before bringing an EPA suit in court). EPA suits must be brought within 2 years (3 years for willful violations) of the alleged EPA underpayment.

**X**   Copy of Charge

**On Behalf of the Commission**

J. D. Packwood, Jr., Area Director
TYPED NAME AND TITLE OF ISSUING OFFICIAL

5-26-25
(DATE)

cc:
Mr. Philip Davis, Esq.
Palms of Pasadena/Nat'l Medical
2700 Colorado
Santa Monica, CA  90404

Bonita M. Riggens
Acosta & Mann, Attorney's
100 2nd Ave., S., Ste. 901
St. Petersburg, FL  33701

EEOC Form 161-B

Case 8:00-cv-00684... Document 56   Filed 11/14/00   Page 51 of 71  PageID 536

**NME**

| | | | |
|---|---|---|---|
| ORIGINAL DATE: | REVISED DATE: | | PAGE NUMBER: |
| 1/1/93 | 9/15/93 | | 1 of 2 |
| SUBJECT: | PROBLEM RESOLUTION | | CORPORATE APPROVAL *Alan R Ewalt* |
| POLICY NUMBER: 110 | | | FACILITY APPROVAL |

## PURPOSE

To provide supervisors with appropriate guidelines for addressing employee problems and concerns.

## POLICY

Positive employee relations and morale can be best achieved and maintained in a working environment that promotes ongoing open communication between supervisors and their employees, including open and candid discussions of employee problems and concerns. NME encourages its employees to express their problems, concerns and opinions on any issue. Toward that end, it is the policy of the company to provide a procedure through which employees can express problems, concerns and opinions without fear of retaliation or reprisal. The Performance Management policy provides a similar procedure that also allows employees to express problems, concerns or opinions about conduct or performance issues.

## PROCEDURE

### Employees

1. Address concerns regarding any issue to facility management in the following order: (a) immediate supervisor, (b) department manager, (c) department head/director, d) senior administrative officer of the facility.

2. If, for any reason, it is either uncomfortable or inappropriate for the employee to follow the order set forth in item 1 above, the employee should address such concerns to the facility Human Resources Department or directly to a member of the facility's administrative team.

3. If an employee concern or problem cannot be satisfactorily resolved within the facility, the employee should address the concern to Regional Operations.

Case 8:00-cv-01046-DKC Document 77-7 Filed 07/11/2003 Page 52 of 71 Page ID#

# NME

## Human Resources Policies and Procedures

| ORIGINAL DATE: | REVISED DATE: | PAGE NUMBER: |
| --- | --- | --- |
| 1/1/93 | 9/15/93 | 2 of 2 |

SUBJECT:

PROBLEM RESOLUTION

COMPANY APPROVAL

FACILITY APPROVAL

POLICY NUMBER: 110

## Supervisors

1. Promote the spirit of this policy by maintaining an "open-door" attitude about employee problems and concerns at all times.

2. Receive all employee concerns, problems and opinions and explore with the employee suggestions for resolving the issue.

3. Inform the Human Resources Department of all concerns and problems raised by employees and refer those that cannot be resolved within the department to the Human Resources Department for assistance.

4. Maintain the confidentiality of employee concerns and problems at all times, insofar as legal and practical, informing only those personnel who have a "need to know".

## Facility Human Resources

1. Provide assistance and guidance to supervisors in receiving and resolving employee concerns, problems and opinions.

2. Inform facility administration of all concerns and problems raised by employees.

3. Investigate the matter and, if a resolution can be reached within the facility, inform the employee of the results of the investigation and the resolution within seven (7) working days, if possible.

4. If a resolution cannot be reached at the facility level, refer the matter to Regional Operations for assistance and resolution.

5. Maintain the confidentiality of employee concerns and problems at all times, insofar as legal and practical, informing only those personnel who have a "need to know".

FLORIDA DEPARTME..f OF LABOR AND EMPLOYMENT ..CURITY
UNEMPLOYMENT COMPENSATION APPEALS BUREAU
9215 NORTH FLORIDA AVENUE, SUITE 103
TAMPA, FLORIDA 33612
===============================================================
NOTICE OF DECISION OF APPEALS REFEREE
===============================================================
Docket No. 96-14380U        Jurisdiction: §443.151(4)(a)&(b) F.S.
===============================================================
CLAIMANT/APPELLANT                 EMPLOYER
S. S. No. 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              No. 0592082


LEONA STEELE                       NME HOSPITALS INC
P O BOX 66843                      C/O THE FRICK CO
ST PETERSBURG BEACH FL 33706       P O BOX 283
                                   ST LOUIS MO 63166


BONITA RIGGENS ESQ                 PALMS OF PASADENA HOSPITAL
STE 629                            1501 PASADENA AVE S
501 FIRST AVE N                    ST PETERSBURG FL 33710
ST PETERSBURG FL 33701


                                   PETER W ZINOBER ESQ
                                   201 E KENNEDY BLVD STE 1750
                                   P O BOX 1378
                                   TAMPA FL 33608


===============================================================
Other copies mailed to: UCCO 3647
APPEARANCES:  Claimant and Employer
OUTCOME:  Favorable to the Claimant
===============================================================
**IMPORTANT** - **APPEAL RIGHTS:** This decision will become final unless
within 20 calendar days after the date it is mailed, you file an
appeal, <u>in writing</u>, to the Unemployment Appeals Commission, Room 300,
Webster Building, 2671 Executive Center Circle, West, Tallahassee,
Florida 32399-0681.  Fax (904) 488-2123
===============================================================


**ISSUES INVOLVED: SEPARATION:** Whether the claimant voluntarily left
work with good cause, provided that good cause includes such cause as
is attributable to the employing unit or consists of illness or
disability of the claimant requiring separation; or whether the
claimant was discharged for misconduct connected with work and, if
appropriate, the number of weeks of disqualification, pursuant to
Sections 443.101(1), (9), (10) and (11) and 443.036(26), Florida
Statutes, and Florida Administrative Code Rule 38B-3.020.  The term
"work" means any work, whether full-time, part-time or temporary.

001410

H

Referee's Decision Docket No. 96-14380U                          Page 2
Social Security Number   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


**CHARGES TO EMPLOYER'S EMPLOYMENT RECORD:** Whether benefit payments
made to the claimant shall be charged to the employment record of the
employer pursuant to Sections 443.101(9) and 443.131(3)(a), Florida
Statutes, and Florida Administrative Code Rules 38B-2.026 and
38B-3.018.

FINDINGS OF FACT:  The claimant was employed as a department head
secretary from October 12, 1992, until March 12, 1996.  During the
claimant's employment, the claimant believed that she was being discrim-
inated against.  In the fall of 1994, the claimant filed an EEOC com-
plaint.  In August 1994, the claimant's attorney sent a letter to
corporate headquarters detailing the claimant's allegations.  In June
1995, the director of plant operations was discharged and another direc-
tor was hired.  The director of plant operations served as the claim-
ant's immediate supervisor.  In October 1995, the claimant filed a
federal lawsuit alleging sexual harassment against her employer.  The
claimant's immediate supervisor, the director of plant operations, was
aware of the claimant's lawsuit.  On one occasion, he told the claimant
that she was not to speak about the lawsuit because it intimidated her
co-workers.  Several of the claimant's co-workers were named in the
lawsuit.  In March 1996, another of the claimant's co-workers was dis-
charged.  The claimant and the co-worker believed that he was dis-
charged because of the allegations in the claimant's lawsuit.

On March 5, 1996, the claimant's supervisor walked into her work area.
The claimant's work area was connected to her immediate supervisor's
work area.  The claimant's desk was next to a wall with about two feet
between the end of the desk and the wall.  The claimant's immediate
supervisor stood in that area.  He told the claimant, "Do not use the
facility phones to telephone the discharged employee, and do not
discuss his termination with co-workers."  He advised her that if she
did she was subject to disciplinary action.  He also told the claimant
that another coworker stated that she was harassing him because she
reminded him that he had a deposition for her federal lawsuit.  The
claimant was standing and facing her immediate supervisor.  The
claimant became upset.  The claimant told him that she had to "pee."
He responded that it was not the claimant's break time yet.  The
claimant repeated to her immediate supervisor that she had to "pee."
The claimant's immediate supervisor stated, "You can pee on your lunch
break."

The claimant stood there.  The claimant's immediate supervisor stood in
the 20-inch space and raised his right arm.  The claimant could not
pass her immediate supervisor without touching him.  The claimant did
not want to touch her immediate supervisor because she believed that it
would result in disciplinary action.  While the claimant was attempting
to sit in her chair, the claimant's bladder released.  The claimant's
immediate supervisor remained standing in the area closest to her

Referee's Decision Docket No. 96-14380U                           Page 3
Social Security Number  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

desk.  The claimant contracted her stomach muscles and looked down
towards her feet.  The claimant was checking to see if any urine was
visible.  The claimant believes that her bladder release was connected
to her fibroid problem.  After the claimant's immediate supervisor went
into his office, the claimant went to the restroom.  The claimant was
wearing a feminine napkin which absorbed most of the urine.  The
claimant turned her skirt around and check for any spots.  The claimant
did not see any urine on her clothing.  The claimant returned to her
work area.  The claimant sprayed disinfectant on her chair.  The
claimant placed a towel on her chair.  The claimant was not certain as
to whether or not any urine leaked onto her chair.  The claimant
completed a requisition order to have her chair cleaned.  The claimant
went into another co-worker's office.  There were three people in the
office.  The claimant told her co-worker, "I peed in my pants because
Mr. Park (her immediate supervisor) would not let me go to the
bathroom."

Shortly thereafter, the claimant heard rumors that she was being
discharged.  The claimant gathered some of her belongings and took them
home.  On March 12, 1996, a representative from human resources, the
director of plant operations, and the CEO approached the claimant in
her work area.  The claimant was told that she had lied and that the
employer had several witnesses to establish that she had lied.  The
claimant attempted to respond.  The claimant asked whether or not she
was being discharged.  The claimant was told that she was being
discharged.  The claimant gathered her belongings and another party
escorted her out of the building.

CONCLUSIONS OF LAW:  The law provides that a claimant who has been
discharged for misconduct connected with the work shall be disqualified
from receiving benefits.  "Misconduct connected with work" means
conduct evincing such willful or wanton disregard of an employing
unit's interests as is found in deliberate violation or disregard of
standards of behavior which the employing unit has a right to expect of
its worker; or carelessness or negligence of such a degree or recur-
rence as to manifest culpability, wrongful intent, or evil design, or
to show an intentional and substantial disregard of the employing
unit's interests or of the worker's duties and obligations to the
employing unit.

In cases of misconduct, the employer bears the burden to establish by a
preponderance of the evidence that the claimant committed misconduct.
This employer did not meet the burden.  The claimant testified that her
immediate supervisor blocked her from leaving her work space and she
told her immediate supervisor that she had to use the restroom.  The
claimant testified that her bladder released.  The appeals referee
finds that the claimant's actions were not intentional.  The appeals

001412

Referee's Decision Docket No. 96-14380U                              Page 4
Social Security Number  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

referee finds that the employer failed to meet the burden to establish
that the claimant's actions were intentionally contrary to the
employer's best interest.  Accordingly, the appeals referee finds that
the claimant is not subject to disqualification from the receipt of
unemployment compensation benefits.

There is conflicting testimony in the record.  The employer's witnesses
testified that the claimant at the time of termination, clapped her
hands and told them to pardon her exuberance and the claimant testified
that her immediate supervisor told her that she could "pee" on her
lunch break.  The immediate supervisor testified that he commented that
it was not her break time.  The appeals referee accepted the testimony
of the claimant.  Based on the candor and demeanor of the witnesses,
the appeals referee resolved these issues in favor of the claimant.

Consideration was given to the employer's testimony that the claimant's
actions were outrageous and disruptive to the workplace.  The appeals
referee finds that the employer failed to establish that the claimant's
actions were intentional.  The appeals referee accepted the unrebutted
testimony of the claimant that her bladder release was not an inten-
tional act.  Moreover, the employer failed to rebut the claimant's
testimony that her immediate supervisor was blocking her in her work
space and she was unable to leave the work area.

DECISION:  The claims adjudicator's determination dated April 5,
1996, is reversed.  A fee of $2,295.00 was approved by the referee to
be paid by the claimant.


This is to certify that a copy of
the above decision was mailed to            LYNSONYA D. HARRIS
the last known address of each              Appeals Referee
interested party on SEPTEMBER 9, 1996.

By: _____
              Deputy Clerk


=================================================================
Any questions related to your benefits or claims certifications should
be referred to your local Jobs and Benefits office or Claims
Information Center.
=================================================================

001413

## ARGUMENT

A.  **The Commission May Not Reweigh the Evidence**

The Appeals Referees findings of fact are based upon credibility determinations and cannot be modified or reversed unless they are not based upon substantial, competent evidence. Nading v. Sanibel Packing Company, Inc., 658 So.2d 1155, 1157-58 (Fla. 2nd DCA 1995); Saenz v. Florida Unemployment Appeals Commission, 647 So.2d 283, 285 (Fla. 2nd DCA 1994). This record contains ample conflicting testimony, as evidenced by the Employer's lengthy recitation of selected facts. The Appeals Referee spent eight hours with the parties and the witnesses, viewing their facial expressions, observing their body language and hearing their voice tones. All these physical observations are crucial to making credibility determinations, which is why the Appeals Referee is the factfinder given the responsibility and sole authority to weigh the evidence and judge the credibility of the witnesses.

The Commission is prohibited from reweighing the evidence. Nading, 658 So.2d at 1157; Johnston v. Homeowners Warehouse, Inc., 654 So.2d 934 (Fla. 3d DCA 1994). Where the testimony is in conflict, it is the role of the appeals referee as the fact finder to make the credibility determination. Scholastic Book Fairs, Inc. v. Unemployment Appeals Commission, 671 So.2d 287, 288 (Fla. 5th DCA 1996); Nading, 658 So.2d at 1158.

B.   <u>Claimant Steele Did Not Engage In Misconduct</u>

Claimant Steele did not engage in misconduct.

Testimony given during the hearing established that the Employer terminated Claimant Steele based upon the following accusation:

1.   Ms. Steele deliberately urinated in her clothing while her supervisor, David Park, while was talking with her.

2.   Ms. Steele urinated in her clothing so that she could tell other coworkers that David Park made her do it.

3.   Ms. Steele's intentional urination was for the motive of making David Park "look bad".

The Appeals Referee saw the ludicrous pretext in this explanation, which in fact was a poorly disguised ruse to terminate Ms. Steele after learning of her revelations during her deposition less than one month earlier.

Misconduct usually involves repeated violations of explicit policies after repeated warnings.  In fact, misconduct usually involves an open refusal to perform, a flaunting of authority, or a repeated failure to follow an employer's instructions.  <u>Fiedler v. Burdines, Inc.</u>, 654 So.2d 1276, 1277 (Fla. 2nd DCA 1995). Additionally, in order to constitute to misconduct under the unemployment statute, a claimant's action must be more than error in judgment or discretion, but must be wilful.   <u>Blumetti   v. Unemployment Appeals Commission</u>, 675 So.2d 689, 689-90 (Fla. 5th DCA 1996); <u>Proffitt v. Unemployment Appeals Commission</u>, 658 So.2d 185, 187 (Fla. 5th DCA 1995).

In determining whether misconduct has occurred, the statutes

must be liberally construed in favor of the claimant. <u>Livingston v.</u> <u>Tucker Construction & Engineering, Inc.</u> 656 So.2d 499, 500 (Fla. 2d DCA 1995)  <u>Proffitt v. Unemployment Appeals Commission</u>, 658 So.2d 185, 187 (Fla. 5th DCA 1995).  Further, misconduct which is serious enough to warrant discharge is not necessarily serious enough to warrant the denial of unemployment benefits based upon misconduct. <u>Livingston</u>, 656 at 500.   <u>Blumetti</u>, 675 So3d at 689.

In this case, Ms. Steele did not engage in any misconduct, but rather, was the victim of misconduct and a civil tort by David Park

The Commission should adopt the Appeals Referee findings.

## CONCLUSION

Clearly, the Employers intense effort to reconstruct only that testimony favorable to their theory in a belated attempt to show that Ms. Steele was a problem employee looking to get fired is simply a request for the Commission to impermissably reweigh the evidence. The decision of the Appeals Referee was based on substantial, competent evidence and should not be modified or reversed.

Bonita M. Riggens
501 1st Avenue North
Suite 629
St. Petersburg, FL  33701
Phone:     813-898-1401
Fax:       813-898-1312
FBN #400424
SPN #00633400
Attorney for Claimant/Appellee

# PERFORMANCE MANAGEMENT PROGRAM
## RECORD OF CONFERENCE

**nme**

EXHIBIT
7
10-17-96 A.T.

☐ First Conference          ☐ Second Conference

Name of Employee _LEONA STEELE_          Today's Date _10-13-95_

Position _SECT._          Date of Hire _____

Department _PLANT OPERATIONS_

Supervisor's Name _DAVID PARK_          Position _DIRECTOR_

REASON FOR CONFERENCE (Completed by Supervisor) _MAKING STATEMENTS ADVERSE TO THE FACILITY'S INTEREST. Mr. STEELE TOLD ANOTHER DEPARTMENT EMPLOYEE, TO GET A RELEASE TO RETURN TO WORK, HURT THEMSELF ON THE JOB, AND THEN LET A JURY DECIDE._

ACTION PLAN FOR IMPROVEMENT (Completed by employee and supervisor at time of conference. Identify the length of time performance will be monitored and other information which will assist the employee to understand and meet expectations).

_THIS STATEMENT IS IN VIOLATION OF 2 SECTIONS OF RULES OF CONDUCT FOR EMPLOYEES. IT IS A STATEMENT NOT IN THE INTEREST OF PROTECTING THE SAFETY OF ANOTHER EMPLOYEE. IT IS ADVERSE TO THE FACILITY'S INTEREST. (ANY) REPEATED OCCURRENCE(S) WILL RESULT IN DISCIPLINARY ACTION(S)._

I understand that my failure to improve my performance as set forth above may result in further disciplinary action, up to and including the termination of my employment. I acknowledge receipt of a copy of this record.

_R.T.S_

EMPLOYEE SIGNATURE _____          DATE _____

SUPERVISOR SIGNATURE _____          DATE _10/13/95_

I

May 7, 1996

To Whom it May Concern:

This is to verify that at no time in my 3 1/2 year acquaintance with Ms. Leona Steele has she ever in any way encouraged me to hurt myself. At the time Mr. Park claims we were discussing my hurting myself at work for the purpose of filing a Workers Compensation suit, (October of 1996,) I was a post surgical patient with a 6 inch horizonal incision below my abdomen.   I am an insulin dependent diabetic and deliberately hurting myself, for any purpose, would most likely have been fatal. Mr. Park's speculation of one side of a phone conversation he thinks he overheard in the next room is foolish and just not true.  This is a very serious allegation and in an effort to have it removed from her record, on two separate occasions, Ms. Steele ask for a meeting between herself, Mr. Park, myself, and anyone else involved, for the purpose of determining what was actually said and in what context. Mr. Park, of course, denied this request stating that he was the boss, and his perception of a situation is the truth. As you know, my efforts to resolve this serious allegation against Ms. Steele and myself were futile.

Should you require further information regarding my conversation with Ms. Steele please contact Ms. Bonita Riggens, Esq.

Thank you.


William N. Hansen

5/8/96
Date:

1   was -- we felt like that was more of a natural course

2   rather than -- it was in a response to concerns.

3        Q    Okay.  Did you ever have a conversation with

4   Mr. Falke about Lee Steele's satisfaction concerning the

5   measures which had been taken to deal with her complaints?

6        A    No.  I can't say that was a specific item.  I

7   was more left to the idea that if she didn't feel it was

8   effective, she would certainly have vocalized that.

9        Q    Okay.  Let me ask you:  What happened after

10  Diane Stanton finished her investigation?  What was the

11  next thing?  What was the outcome of that investigation to

12  your knowledge?

13       A    I wasn't told of any specific outline (sic)

14  with -- I mean I wasn't informed about any of the

15  investigation.

16       Q    Okay.

17       A    I was basically asked to determine what my

18  knowledge was of any of the alleged incidents.

19       Q    Okay.  Now, were you aware of an allegation

20  which had been made against Ms. Steele that she had been

21  attempting to defraud Worker's Comp.?

22       A    Defraud Worker's Comp.  No.

23       Q    Are you aware of any allegations that have been

24  made by her -- or against her?  I'm sorry.  Scratch that.

25            Did Mr. Park ever tell you that he overheard

LAWYERS' CHOICE, INC.

1    Lee Steele tell Mr. Hansen during the telephone call that

2    he should hurt himself on the job and then file a lawsuit

3    or a Worker's Comp. claim?

4         A    Could you please repeat that question?

5         Q    Sure.  Did you have any -- did Mr. Park ever

6    tell you about a telephone conversation during which he,

7    allegedly, heard Ms. Steele telling Mr. Hansen that he

8    should hurt himself and then file a lawsuit or Worker's

9    Comp. claim?

10        A    Mr. Park told me that he had overheard

11   Ms. Steele on the phone with another individual, and it

12   was -- and to -- similar; that if you go ahead and do

13   that, you can just get hurt or something like that, yes.

14   That is what Dave told me.

15        Q    Well, what did you consider that to be?

16        A    Well, I didn't follow-up on it because it was

17   just -- there wasn't any substance to it.

18        Q    So you didn't believe it when Mr. Park told you

19   that?

20        A    No.  But it wasn't that I didn't believe

21   Mr. Park, that he had understood that or he had overheard

22   that, but there was not any wrongdoing.

23        Q    Okay.  Did you ever investigate this allegation

24   with Ms. Steele herself?

25        A    No.  Because I didn't feel there was any

LAWYERS' CHOICE, INC.

1    wrongdoing.

2           Q    Okay.  Did you ask Mr. Park how he knew it was

3    Mr. Hansen at the other end of the line?

4               MR. ZINOBER:  Objection to the form of the

5         question.  I don't believe Mr. Park -- I don't

6         believe Mr. Schlagheck testified that he knew it was

7         Mr. Hansen on the other end of the line.

8    BY MS. RIGGENS:

9           Q    No.  I didn't mean to imply that.  I think you

10   said that Mr. Park said he had overheard a conversation

11   between Ms. Steele and Mr. Hansen; is that right?

12              MR. ZINOBER:  I think he said it was someone

13        else.

14              THE DEPONENT:  It was someone else.

15   BY MS. RIGGENS:

16          Q    Okay.  Did you ever have any conversation with

17   Albert Shamro concerning hearing a conversation by

18   Ms. Steele?

19          A    You'll have to be a little bit more specific.

20          Q    Regarding hearing -- well, the same

21   conversation regarding you should hurt yourself or file a

22   suit or whatever was alleged to have been heard?

23          A    No.  I never talked with Albert.

24          Q    So the only person whoever talked to you about

25   that was Mr. Park?

1       A       That's correct.

2       Q       For what purpose was he telling you that?

3       A       I don't know.  I suspect to inform me of what

4    he had heard.

5       Q       Okay.  Why did --  It was your impression that

6    Mr. Park felt that there was some wrongdoing there?

7       A       No.  I think he just found it interesting.

8       Q       Okay.  When there was a performance management

9    conference which took place between the supervisor and

10   employees, there's a write-up which is given; is that

11   correct?

12      A       Yes.

13      Q       Okay.  And, as Mr. Park's superior, and as the

14   person responsible for the Plant Operations Department, if

15   an employee in the Plant Operations Department was written

16   up on a Performance Management Conference, would you have

17   then received and reviewed a copy of that Performance

18   Management write-up?

19      A       Yes.  I would normally receive a copy of that.

20      Q       Okay.  And then what do you do with that?

21      A       If it requires my signature, I, of course,

22   would sign it.  And it probably would be forwarded to the

23   Human Resource Department to go in the person's file.

24      Q       Okay.  I'm going to show you a document that

25   I've had identified as Plaintiff's Exhibit 1.

LAWYERS' CHOICE, INC.

November 19, 1995


Dan Bonk:

Per your directive of November 7, 1995 I am stating that I have not audio taped any of my coworkers before or after October 26, 1995.

Lee Steele


cc:  Bonita Riggens, Esq.

002537

1          Mr. Park.

2               MS. RIGGENS:  I object to that.  That is not

3          what he testified to.  That is not.

4               You are -- you are making argument on that

5          and that is just not what he testified to.

6               MS. HARRIS:  Okay.  I'm not going to resolve

7          that issue.  I don't think I have to.  But if you

8          have another question now, go ahead, Ms. Riggens.

9     BY MS. RIGGENS:

10         Q    Okay.  Now, Mr. Bonk, you have said you

11    believe that Ms. Steele was taping people at the

12    hospital.  Correct?

13         A    Yes.

14         Q    What evidence do you have of that?

15         A    I was told that she was by Mr. Park.

16         Q    Okay.  So hearsay from Mr. Park is the only

17    evidence you had that she was taping at the hospital.

18    Is that correct?

19         A    Yes.

20         Q    Okay.

21              MS. RIGGENS:  Lee, if you want to go outside,

22         go outside, okay?  But do not -- I mean, don't say

23         a word.

24    BY MS. RIGGENS:

25         Q    Did you ever see her taping anyone yourself?

Ms. Riggens

5/14/96

Response to document found in copy of my personnel file turned over to us by Mr. Zinober.  It appears this is Mr. Bonk's summary of his reasons for the paid decision making day.

1.     What he means by my refused to participate in a counselling session is that I disagreed with Mr. Park and refused to admit to his allegations.  By failed to acknowledge the reason for the previous conference, he must mean the "workers comp fraud" meeting?  Typically, they will accuse you of something, if you deny it, they accuse you of calling them a liar, they then suspend you and will not allow you to come back to work without a written statement admitting to what they accused you of in the first place.  I guess being confrontational and argumentative to the department director was denying the charges he made against me and asking for meetings to try to clear things up.

2.     This must be the memo to Peggy Edwards, which I discussed with Mr. Park prior to sending it.  He did not tell me not to.

3.     He obviously means that my refusal to comment on a criminal activity without you present means that I am admitting to something.  I don't know what he means about the inappropriate activity being discussed several times with Ms. Steele, myself, Ron Robinson, and John Bartlett.  The only tape recording I ever discussed with any one was the one Mr. Bartlett agreed to my making of our meeting.  The tape recorder was on the table the whole time.  I have asked permission several times to tape meetings and been turned down.  I never taped them.

4.     I gave him the statement you drafted.  Nothing was mentioned in the post decision making leave conference regarding tape recordings.

As you can see this is typed on a separate piece of paper with no signatures or initials or indication of what it goes with or who did it.  The bottom of the DML form is not filled in or signed.

I am still very angry about the allegations he has made and look forward to finally getting to the bottom of them.

```
 1           conclusion that the witness isn't qualified to

 2           make.

 3                  MS. RIGGENS:  Well, you can strike it

 4           later on.

 5                  MR. ZINOBER:  You don't have to answer it

 6           until the referee tells you to, if she does.

 7                  MS. HARRIS:  Ms. Riggens, could you

 8           rephrase that so it doesn't speak to something

 9           he doesn't have any knowledge of?

10    BY MS. RIGGENS:

11        Q    Did Mr. Park tell you why he felt it

12    would be better to isolate Ms. Steele from

13    coemployees who were going to be deposed in her

14    case?

15        A    David stated to me that he felt that

16    after the depositions, that in order for employees

17    to come and see him going through her office, that

18    would make his employees more comfortable without

19    having to pass through her office.

20        Q    Was Ms. Steele not his employee?

21        A    Correct.  I think that he would feel like

22    both of them -- that there may be hard feelings on

23    both sides.

24        Q    Why did he tell you that?  Why would

25    there be hard feelings?  Did he explain what he
```

K

**DREYER & ASSOCIATES**

1775 TAMPA CITY CENTER
TAMPA, FLORIDA 33602

COURT REPORTERS
(813) 229-1545

POST OFFICE BOX 1482
TAMPA, FLORIDA 33601

1   meant by that?

2       A   No.  That's just what he had stated to

3   me.

4       Q   Did you ask him why there would be hard

5   feelings?

6       A   No, because I think I probably generally

7   felt that there might be anticipation that there

8   would be hard feelings with co-workers.

9       Q   Tell me from your knowledge why you would

10  anticipate that there would be hard feelings.

11          MR. ZINOBER:  Ms. Harris, this is really

12      really far afield.  This really has nothing

13      whatsoever to do with the termination.

14          MS. HARRIS:  Well, he just said he had

15      knowledge of it.

16          So you have to answer that question.

17      A   I would only expect that when people are

18  brought into a lawsuit, that they would feel

19  uncomfortable, the employees would feel

20  uncomfortable, in a lawsuit.  It's not an everyday

21  occurrence.

22          MS. HARRIS:  Is that it, Ms. Riggens?

23          MS. RIGGENS:  Yes.

24          MS. HARRIS:  Redirect, Mr. Zinober?

25          MR. ZINOBER:  I have none.

1775 TAMPA CITY CENTER
TAMPA, FLORIDA 33602

DREYER & ASSOCIATES
COURT REPORTERS
(813) 229-1545

POST OFFICE BOX 1482
TAMPA, FLORIDA 33601